# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### February 2, 2010 Session

## ANDREW THOMAS v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 00-03095     James C. Beasley, Jr., Judge**

---

**No. W2008-01941-CCA-R3-PD  - Filed February 23, 2011**

---

Petitioner Andrew Thomas appeals as of right the judgment of the Shelby County Criminal Court denying his petition for post-conviction relief.  A Shelby County jury found Petitioner guilty of felony murder based on the killing of James Day during an attempt to perpetrate a robbery.  The jury found that Petitioner had previously been convicted of one or more felonies for which the statutory elements involved the use of violence to the person. *See* T.C.A. § 39-13-204(i)(2).  The jury further found that this aggravating circumstance outweighed mitigating circumstances beyond a reasonable doubt.  The jury then sentenced Petitioner to death.  Petitioner's conviction and sentence were affirmed on direct appeal by the Tennessee Supreme Court.  *See State v. Thomas*, 158 S.W.3d 361 (Tenn. 2005).  On January 3, 2006, Petitioner filed a pro se petition for post-conviction relief.  On November 13, 2006, Petitioner filed a petition for writ of error coram nobis and an amended petition for post-conviction relief.  The post-conviction court held an evidentiary hearing in October 2007. On August 4, 2008, the post-conviction court entered an order denying Petitioner post-conviction relief.  On appeal to this Court, Petitioner presents a number of claims that can be characterized in the following categories:  (1) Petitioner's trial counsel were ineffective; (2) Petitioner's appellate counsel were ineffective; (3) Petitioner is entitled to a new trial based upon newly discovered evidence; and (4) Tennessee's death penalty statutory scheme is unconstitutional.  Following a thorough and exhaustive review of the record and the applicable law, we affirm the judgment of the post-conviction court.

**T.R.A.P. 3 Appeal as of Right; Judgment of the Criminal Court of Shelby County Affirmed**

JERRY L. SMITH, delivered the opinion of the Court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

1

Steven M. Schwartz, Melissa A. Gabriel, Jennifer N. White, Signe B. Purup, pro hac vice, New York, New York; and Sara Willingham, Nashville, Tennessee, for the appellant, Andrew Thomas.

Robert E. Cooper, Jr., Attorney General & Reporter; Michael Moore, Solicitor General; James E. Gaylord, Assistant Attorney General; William L. Gibbons, District Attorney General; Amy Weirich, Assistant District Attorney General; and John Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Facts Underlying Petitioner's Convictions

The following facts are excerpted from our supreme court's opinion affirming Petitioner's conviction and sentence:

### Guilt Phase

Shortly after 12:30 p.m. on April 21, 1997, the defendant and his co-defendant, Anthony Bond, saw an armored truck guard with a money deposit bag leaving a Walgreens drug store on Summer Avenue in Memphis, Tennessee. The defendant ran up, shot the guard in the back of the head, grabbed the deposit bag, and jumped into a white car being driven by Bond. The defendant and Bond abandoned the white car on a street behind Walgreens, got into a red car that the defendant had borrowed from his girlfriend, and drove away.

Betty Gay, a Walgreens[ ] employee, heard the gunshot and then saw the armored truck guard, James Day, lying in the parking lot. She saw a man running from the scene with a gun and the deposit bag. Charles Young, the assistant manager of Walgreens, ran outside and saw Day lying face down in a pool of blood. Day, who was conscious, told Young, "Call my wife." Day remained conscious and continued to talk until an ambulance arrived.

Several witnesses described the cars used by the defendant and Bond and gave descriptions of the occupants to the police. One witness, Richard Fisher, testified that he saw a white car "speed" around the armored truck in the front of the store and that the car was within four feet of him. Fisher later

2

identified the defendant as the passenger in the white car.

Later on the afternoon of April 21st, the defendant and Bond arrived at the apartment of Angela Jackson, who was then the defendant's girlfriend. According to Jackson, the two men were "excited" and "out of breath." After telling Bond to get rid of the gun, the defendant began taking money, checks, and food stamps from small white envelopes that had been in Bond's jacket. The defendant and Bond divided the money.

Jackson testified that later that same day, the defendant bought a customized car with gold plates and spoke wheels for $3,975 in cash. The car was titled in Jackson's name. Afterward, the defendant told Jackson that they needed to get a hotel room. While watching a news report that evening at the hotel about the shooting, the defendant told Jackson that the victim "did not struggle for his life" and that he had "grabbed the nigger by the throat and shot him."

On the day after the shooting, Jackson opened a bank account in her name and deposited $2,401.48 in cash. Two days later, she bought a shotgun because the defendant said they needed it "for protection." According to Jackson, the defendant later bought a gold necklace for himself and wedding rings for both of them. After getting married in May, the couple separated two months later. The defendant told Jackson not to tell police about the robbery.


The victim, James Day, did not immediately die from the gunshot wound to the back of his head. Instead, the gunshot damaged his spinal cord and resulted in paraparesis (a profound weakness in one's abdomen and legs) and neurogenic bladder (a loss of bladder and bowel control due to nerve damage). Faye Day Cain, the victim's widow, testified that her husband underwent numerous surgeries, needed constant care and medical attention, and was unable to work. He was confined to one room, was unable to use the bathroom, and became depressed. In late September of 1999, Day was rushed to the hospital for emergency surgery after his bladder ruptured. The condition caused an infection; Day's condition continued to worsen, and he finally died on October 2, 1999.

The medical examiner for Shelby County, Tennessee, Dr. O.C. Smith, testified that the cause of Day's death was sepsis, "secondary to the rupture of his bladder resulting from spinal cord injury caused by the gunshot wound to his head." Dr. Smith considered Day's death a homicide, and he stated that the "infection from the ruptured bladder" could be "directly related back to [the]

3

gunshot wound." Dr. Smith conceded that Day suffered from heart disease, high blood pressure, diabetes, and obesity, but he stated that these conditions did not cause the death. Dr. Smith's assistant, Dr. Cynthia Gardner, likewise testified that Day's death resulted from the injuries caused by the gunshot wound.

A videotape of the shooting captured by Walgreens' surveillance cameras was played for the jury. A videotape made from the original was also played for the jury at a slower speed. Angela Jackson identified the defendant as the gunman who shot the guard in the back of the head from a still photograph that had been made from the videotape.

After considering the evidence, the jury convicted the defendant of felony murder based on the killing of the victim "during an attempt to perpetrate robbery as charged in the indictment." The trial court then held a sentencing hearing for the jury to determine the punishment.

**Penalty Phase**

To support the prior violent felony aggravating circumstance, the prosecution introduced evidence that the defendant had prior convictions for felony offenses whose statutory elements involved the use of violence to the person. *See* Tenn. Code Ann. § 39-13-204(i)(2) (2003). The proof showed that in September of 1994, the defendant was convicted of seven counts of aggravated robbery and one count of robbery. In January of 1994, the defendant was convicted of one count of aggravated robbery.

The indictments underlying the defendant's prior convictions for aggravated robbery revealed that the offenses involved the defendant's use of a firearm and involved different victims. On January 4, 1993, he used a firearm in taking between $1,000 and $10,000 from Michael Osborne. On February 1, 1993, he used a firearm in taking between $1,000 and $10,000 from Booker Sanders, and he used a handgun in taking money and food stamps totaling $1,000 to $10,000 from Lee Harris. On March 8, 1993, he used a firearm in taking money and checks totaling $500 to $1,000 from Amos Kirby. On March 12, 1993, he used a firearm in taking checks valued under $500 from Carl Hutchinson. On March 15, 1993, he used a firearm in taking money and checks totaling $500 to $1,000 from Onie Massey, and he used a firearm in taking between $500 and $1,000 from Dewayne McCoy. On June 25, 1993,

4

he used a pistol in taking jewelry valued at $1,000 to $10,000 from Gary Smallwood.

The prosecution also introduced the testimony of Faye Day Cain, the widow of the victim, James Day. She testified that her husband had worked two jobs to support his family before he was shot and that she was unable to work due to a medical condition known as thrombophlebitis. She testified that since her husband's death, she and the couple's minor son lived on disability payments and social security benefits. Ms. Cain testified that the victim had been her husband, confidant, lover, and best friend. After the shooting, however, she and her husband could no longer have physical contact or intimacy. The victim "couldn't stand to be touched" and "the least little noise would turn him into a frenzy." She testified that she had suffered great emotional pain, that she was no longer a happy person, and that she cried often.

According to Ms. Cain, the couple's son, Cedric, was twelve when his father was shot. They had enjoyed riding motorcycles, having breakfast, and doing "father and son" things. After the shooting, however, Cedric became "hurt and angry."

After the prosecution rested, the defendant presented evidence of mitigating circumstances. The defendant's mother, Luella Barber, testified that the defendant was born in February of 1973. She said the defendant's father, Andrew Thomas, Sr., did not visit the family regularly; he abused drugs, abused her in the defendant's presence, and was often in jail. Ms. Barber divorced Andrew Thomas, Sr., in 1977, and she later married William Barber. She said that the defendant's stepfather, Barber, also abused her in front of the children and became involved with drugs.

According to Ms. Barber, the defendant started getting into trouble for stealing when he was fourteen. Although the defendant dropped out of school, he received his GED and a certificate as a residential plumber's helper while in jail. Ms. Barber said that she loved her son and that her life would not be the same without him.

5

Several other family members also testified on behalf of the defendant.

Alacia Bolden, the mother of the defendant's eight-year-old son, testified that their son loved his father and continued to have a close relationship with him. Andre Barber, the defendant's brother, testified that he had always looked up to the defendant, that they had a close relationship, and that they talked often. He said that losing the defendant would "devastate" their mother. Similarly, Stephanie Williams and Tamara Weeks, the defendant's cousins, testified that they had close relationships with the defendant. Williams said that she did not want to see the defendant die, and Weeks believed that the defendant was an important male figure in his son's life despite his incarceration.

The jury imposed the death penalty after finding that the evidence supporting the sole aggravating circumstance outweighed the evidence of mitigating circumstances beyond a reasonable doubt.

*Thomas*, 158 S.W.3d at 373-76.

## Proof at the Post-Conviction Evidentiary Hearing

An evidentiary hearing was held in the Shelby County Criminal Court during the first week of October 2007. At the hearing, the following proof was presented.

Petitioner's co-defendant Anthony Bond refused to testify at the post-conviction hearing. In lieu of his testimony, Petitioner's counsel introduced Co-defendant Bond's testimony from a federal court proceeding on September 6, 2007. The federal hearing was in response to Petitioner's request for a handwriting sample from Co-defendant Bond. Co-defendant Bond refused to provide a handwriting sample and testified that he was aware that he may be held in contempt of court for refusing to do so. Co-defendant Bond did concede that he was the author of a letter on pink paper sent to Petitioner's counsel and that he filed a pro se §1983 lawsuit. He explained, however, that he could not recall whether he personally wrote the § 1983 pleading himself or whether someone else wrote it for him. Co-defendant Bond denied writing the alleged recantation. In the letter, Co-defendant Bond allegedly admits that he and Angie Jackson falsely implicated Petitioner in the Walgreens robbery.

6

Marty Pearce, a certified document examiner, was retained by Petitioner to perform handwriting analysis regarding the recantation letter purportedly authored by Co-defendant Bond. In rendering her analysis, Ms. Pearce examined the alleged recantation letter, the copy of an envelope addressed to Petitioner from Co-defendant Bond, a copy of the letter sent by Co-defendant Bond to Petitioner's counsel, a letter to the Honorable Bernice Donald by Co-defendant Bond, and the §1983 pleading filed by Co-defendant Bond in federal court. Ms. Pearce identified the letter to Petitioner's counsel, the letter to Judge Donald, and the federal § 1983 pleading as "known documents," a sample of writing that can be used as a starting point because the author is known. Ms. Pearce explained that she made copies of these documents and cut out letters so she could make a comparison of the individual letters. In her analysis, Ms. Pearce "look[ed] for some similarities and also for differences, and that would include everything from the spacing, the size of the writing, the margins, the stroke formations and so on." As a result of her examination, Ms. Pearce concluded with one hundred percent certainty that Co-defendant Bond was the author of the recantation letter.

Jeffrey Glatstein testified that he sat as "second chair" at Petitioner's trial. He stated that Michael Scholl was appointed lead counsel and selected him to sit as co-counsel in the case. Mr. Glatstein had previously been second chair on another capital case. He explained that "because [he and Mr. Scholl] were in the office together . . . it was convenient. We sort of did everything together. So we didn't have a true division of labor . . . ."

Mr. Glatstein stated that he did not recall hiring a mitigation expert or a medical expert. He recalled that counsel for Co-defendant Bond had a medical expert and this information was shared with Petitioner's defense team. He further stated that they may have relied on Clark Chapman, their investigator on this case, for mitigation evidence. Mr. Glatstein conceded that he had poor recollection of this case. He explained that he began phasing out the criminal area of his legal practice and was preparing to attend graduate school. He admitted that, at the time of the trial, he was "wrapping" up his law practice. He added that Mr. Scholl was "handling ninety percent of the items that came up in this case." As to his recollection of the case, Mr. Glatstein related that "one part of our defense was identification." He explained that their position was that Petitioner could not be identified from the video surveillance tape. He also recalled that causation of death was an issue because the victim died from a bacterial infection. He stated that Co-defendant Bond's counsel had taken the lead on the causation issue, and Petitioner's defense team had "[ridden] those coattails." Mr. Glastein further explained that he and Mr. Scholl interviewed the State's medical experts.

7

Robert Brooks represented Petitioner on direct appeal. He related that, in preparation of the appeal, he read the entire pretrial and trial record. Mr. Brooks stated that he was familiar with the United States Supreme Court case of *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620 (1968), which prohibited a non-testifying defendant's confession to be used against a co-defendant . Mr. Brooks conceded that Co-defendant Bond did not testify at the state trial. He agreed that one way to comply with *Bruton* would be to redact the confession so that nothing implicates the non-confessing co-defendant. He further agreed that a limiting instruction is also required under *Bruton*. Mr. Brooks conceded that failure to comply with the requirements of *Bruton* would amount to a systematic violation of the Confrontation Clause. Mr. Brooks stated that he did not raise any issues relating to the redacted confession on direct appeal. Mr. Brooks stated that, on appeal, he was restricted to those issues raised by trial counsel unless he could establish plain error.

Mr. Scholl testified that he was appointed as lead counsel in Petitioner's capital trial. Mr. Scholl explained that he was "solely responsible for the entire case." "The way I look at it I make all the final decisions on everything." Regarding Petitioner's case, Mr. Scholl agreed that there was an issue regarding causation in Mr. Day's death. In this regard, he asserted that there was a "big discrepancy over a statute . . . what we called a-year-and-day rule which involved the time of death of a person being a year and a day after a homicide." The other big issue was whether Co-defendant Bond's confession could be used at a joint trial. He explained that there was an objection raised to the use of the statement, but there was a lot more to the severance issue than just Co-defendant Bond's statement.

Mr. Scholl stated that Co-defendant Bond was Petitioner's co-defendant. He stated that Mr. Bond was represented by Howard Manis and Lorna McClusky. Co-defendant Bond had given a confession as to his participation in the robbery and shooting of James Day. Additionally, Co-defendant Bond had testified against Petitioner in Petitioner's federal trial.[1] Mr. Scholl explained that their position was that Petitioner had nothing to do with the Walgreens robbery. Mr. Scholl stated that he moved to sever the trials of Petitioner and Co-

---

[1]Co-defendant Bond was arrested in the fall of 1997 on unrelated charges. After his arrest, police identified Co-defendant Bond's fingerprints on the stolen getaway car from the Walgreens robbery. Co-defendant Bond subsequently confessed to his and Petitioner's involvement in the Walgreens robbery. On June 15, 1998, a federal grand jury returned a three count indictment against Petitioner and Co-defendant Bond. Petitioner was convicted in federal court of one count of interfering with commerce by threat or violence, one count of using or carrying a firearm during the commission of a crime of violence, and one count of being a convicted felon in possession of a firearm. Co-defendant Bond entered a guilty plea to one count of robbery affecting commerce. Petitioner received a sentence of life in prison plus five years. Co-defendant Bond was sentenced to twelve years. *See United States v. Thomas*, 29 Fed.App'x 241 (6th Cir. 2002).

defendant Bond because the prosecution was going to use the transcripts of Petitioner's federal trial. At the federal trial, not only had Co-defendant Bond provided a confession but also had testified against Petitioner. Mr. Scholl asserted that the basis of the motion to sever was that he "did not have the opportunity to cross-examine Mr. Bond in the same method as his attorney in federal court that I had a different interest because this was a homicide case as opposed to a robbery case." Mr. Scholl further explained that, at the federal trial, Co-defendant Bond testified and was able to be impeached with his prior record. By the time of Petitioner's state trial two years later, Co-defendant Bond had been convicted of several other additional offenses. Mr. Scholl explained that he had moved in state court to be permitted to impeach Co-defendant Bond, although he was unable to cross-examine him personally. Mr. Scholl explained the conundrum of not severing Petitioner's and Co-defendant Bond's state trials: "So what happens at that point is that the issue becomes now Mr. Bond can't get a fair trial without his prior record being held out of evidence, and I should have the right to confrontation and bring up this impeachment material." As a result of Mr. Scholl's argument, the trial court severed the two cases. Mr. Scholl explained, however, that as a result of the severance, "the statement gets thrown out, the transcripts come in." In his opinion, "[t]he transcripts were way worse than the statement was." He stated that Petitioner's defense team was in a "Catch 22 situation." At the time, he opined that separate trials were the better option because he would have been able to introduce Co-defendant Bond's prior convictions.

Despite the initial severance, a few months later the cases were rejoined. Mr. Scholl explained that the prosecution had advised the parties that they had decided not to go forward with the introduction of the transcripts. Mr. Scholl deemed this as a huge victory for Petitioner because "the transcript would not only spell out Co-defendant Bond's name, it would spell out what Andrew did or what he said Andrew did, and the whole story would be laid out name by name." The prosecution then advised the parties that Co-defendant Bond's confession would be redacted in part. Mr. Scholl was not certain for the reason of the joinder, but speculated that it may have been for judicial economy. In Mr. Scholl's opinion, the State's case against Mr. Thomas would have been much stronger had they used the transcripts rather than the redacted statement. In this regard, he stated that "the heat went off of me and went onto Mr. Manis' client so I was taking full advantage of that."

Mr. Scholl stated that he was familiar with the United States Supreme Court's decision in *Bruton*. Mr. Scholl stated that Co-defendant Bond did not testify at trial. Mr. Scholl agreed that, under *Bruton*, a non-testifying defendant's confession could be used if the statement was redacted so that nothing implicates the non-confessing defendant and that a limiting instruction is given to the jury. Mr. Scholl testified that the redacted statement "took out any reference to Andrew, and I didn't think added anything in the case except that

9

Co-defendant Bond did it . . . and he was involved with somebody else." Mr. Scholl conceded that the statement referred to "Bowlegs." Mr. Scholl stated that he understood that "Bowlegs" was Petitioner. Mr. Scholl also conceded that, at trial, he admitted that he had no problems with the redacted statement. He did not object to the redacted statement that was ultimately introduced at trial because the statement "went into evidence exactly as I'd asked it to." In his opinion, the redacted statement complied with the dictates of *Bruton*.

Regarding the redacted statement, Mr. Scholl testified that any mention of the accomplice known as Bowlegs had been removed and replaced with the words "the other person." Mr. Scholl stated that, in other portions of the redacted statements, there were white spaces. He agreed that "it's pretty obvious from the condition of this statement that it's been redacted and it's been altered." Mr. Scholl stated that, "This whole portion right here which describes the entire robbery I had moved for that to be taken out, and Judge Dailey agreed and had it redacted. That's the biggest part of it, but also the part . . . about what the other person was wearing was initially redacted out." Mr. Scholl testified that "the other person" to whom he was referring was Petitioner.

Mr. Scholl stated that, during trial, his theory was that the crime was committed by Co-defendant Bond and another person, who was not Petitioner. Mr. Scholl stated that the "other person" on whom Petitioner's defense focused was an individual named Bobby Jackson. Mr. Jackson, Mr. Scholl explained, had a relationship with Angela Jackson, the State's key witness. Mr. Scholl stated that Mr. Jackson had been identified in a photo-lineup by one of the eyewitnesses.

Mr. Scholl explained that, at trial, he was adamant about having the description of the accomplice's clothing in the statement. The reason was there were varying descriptions of what the second person was wearing. Co-defendant Bond had described the person as having a striped shirt and shorts. Mr. Scholl wanted the description of the clothing in evidence to establish the inconsistencies among all of the descriptions.

Mr. Scholl testified that, at the joint trial, witness Betty Gaye described the shooter as wearing khaki shorts or pants. Ms. Gaye also stated that the shooter wore a light-colored jacket. Mr. Scholl stated that this description was inconsistent with the description provided by Co-defendant Bond. Mr. Scholl stated that witness Christopher Sains testified that the shooter was wearing a baseball hat. Mr. Scholl stated that witness Richard Fisher testified that the driver of the getaway vehicle was wearing a baseball hat. He added that Ms. Jackson stated that Co-defendant Bond was wearing a yellow, light-colored jacket when he

10

and Petitioner returned to her apartment. Mr. Scholl summarized that, during the trial, conflicting descriptions of the perpetrators were given by four witnesses.

Mr. Scholl identified an FBI report regarding Bobbie Fleming, a customer at Walgreens. The report reflected that Ms. Fleming identified the perpetrator as "a black male . . . medium height . . . twenty-five to thirty years of age with a slight beard, wearing a blue baseball cap and a tan shirt with horizontal red and blue stripes and blue pants." Mr. Scholl conceded that this description contradicted the description in both Ms. Jackson's testimony and Co-defendant Bond's confession. Mr. Scholl stated that Ms. Fleming was not called as a witness, and her identification was not used at trial. Mr. Scholl explained that the FBI 302 report containing Ms. Fleming's identification of the perpetrator was inadmissible at trial.[2]

Mr. Scholl also identified an FBI 302 report regarding Gail McDonald, another customer at Walgreens. Ms. McDonald identified the shooter as wearing a "blue baseball cap, blue and white short-sleeved, pinstriped shirt, light-blue jeans, and white tennis shoes." He admitted that this description was similar to the description provided by Ms. Fleming. Ms. McDonald was not called as a witness at trial. Mr. Scholl explained that he decided not to call Ms. McDonald and Ms. Fleming as witnesses out of concern that they would be able to identify Petitioner as the shooter in court.

Mr. Scholl agreed that the prosecution relied upon Co-defendant Bond's description of the shooter's clothing in their closing argument. In his opinion, the prosecution was attempting to draw a correlation between Co-defendant Bond's confession and Ms. Jackson's description. He did not object to this argument. He agreed that no limiting instruction was given by the judge regarding the redacted confession. Mr. Scholl stated that, in his opinion, the lack of a limiting instruction had no impact because "[y]ou either believed Ms. Jackson, or you didn't believe Ms. Jackson."

Mr. Scholl testified that, during the State's opening and closing argument, the prosecutor referred to Petitioner as "greed and evil." He admitted that the prosecutor's references to "greed and evil" were numerous. Mr. Scholl conceded that he did not object to this characterization. He admitted that he should have objected to the reference. He noted that

---

[2]"A 302 report is an FBI investigation form containing interview notes made by the interviewing agent." *Evans v. United States*, 284 Fed. Appx. 304, 309 (6th Cir. 2008) (citing *United States v. Nathan*, 816 F.2d 230, 236-37 (6th Cir. 1987); *United States v. Minsky*, 963 F.2d 870, 872 (6th Cir. 1992)).

the issue was raised on direct appeal.[3]

Mr. Scholl reiterated that the defense theory was that Petitioner did not actually participate at all in the robbery and that Ms. Jackson was lying about the situation. He stated that their theory was that Ms. Jackson had developed a relationship with Mr. Jackson and that this relationship plus statements that she had made about seeking revenge on Petitioner, were her motive to fabricate Petitioner's involvement in the crime. Mr. Scholl related that one witness had identified Mr. Jackson as the perpetrator and that Mr. Jackson had committed a similar crime at the Southbrook Mall. Mr. Scholl stated that presenting Mr. Jackson as the perpetrator was challenging because if he went too far Mr. Jackson might have been ruled out as a suspect altogether.

Although Mr. Scholl did not represent Petitioner at his federal trial, he did review the transcripts. Mr. Scholl stated that one witness, who had not identified Petitioner previously, walked into the courtroom, "look[ed] through the window in federal court, and he goes there's the guy right there that I saw shoot the armor car driver."

Mr. Scholl agreed that a major issue in this case was causation. That is, if the gunshot wound did not cause Mr. Day's death, there was no homicide. Mr. Scholl stated that they "attacked causation heavily." He stated that they accomplished this through cross-examination of the State's experts. Mr. Scholl explained that they could not find an expert to disagree with Dr. Smith's recommendations or findings on the case. Mr. Scholl related the testimony of Dr. Smith. Dr. Smith, in essence, concluded that the gunshot wound led to Mr. Day's death. Specifically, Dr. Smith concluded that the "gunshot wound led to the eventual cause of a neurogenic bladder in Mr. Day and that the neurogenic bladder ruptured causing his death." Mr. Scholl stated that both he and Mr. Manis conducted a cross-examination of Dr. Smith. Mr. Scholl explained that Dr. Smith's testimony was in the form of a videotaped deposition.

Mr. Scholl testified that Dr. Gardner was a forensic pathologist who assisted with Mr. Day's autopsy and who testified at Petitioner's trial. Her opinion differed from Dr. Smith's

___

[3] Our supreme court adopted this Court's finding, by including the direct appeal as an Appendix. *Thomas*, 158 S.W.3d at 383. The prosecutor's repeated reference to Petitioner and Co-defendant Bond as "greed or evil" was held to be improper. *See Thomas*, 158 S.W.3d at 414. The court noted that the prosecutor made the reference twenty-one times. Notwithstanding, the court, under plain error review, held that the prosecutor's comments, while unseemly, were harmless in the context of the entire argument. *Id.*

in regard to the neurogenic bladder. Dr. Gardner concluded that it was the infection and the sepsis that actually caused Mr. Day's death and not the bladder. Mr. Scholl explained that he agreed with Dr. Gardner's result that Mr. Day's death was caused by the sepsis from a bacteria. Dr. Gardner had explained that the bacteria could have been caused by other things besides the neurogenic bladder. Mr. Scholl testified that he attempted to separate the bacteria from the neurogenic bladder.

Mr. Scholl testified that he had some doctors review Mr. Day's medical records. He stated that Dr. Steven Haney, the Chief Pathologist for the State of Mississippi, and Dr. Michael Alabaster, a local urologist, reviewed Mr. Day's records. These doctors agreed with the State's experts. He agreed that neither Dr. Haney nor Dr. Alabaster were neurologists.

Regarding the cause of Mr. Day's death, Mr. Scholl explained that the issue was whether the victim was put in a situation because of the acts of the defendant and whether the victim's death eventually resulted from that situation. He explained that only an unreasonable intervening cause could break the chain of causation. Mr. Scholl added that, because the medical testimony was so convoluted and long, he attempted to focus on the specific differences in the testimony of Dr. Smith and Dr. Gardner.

On cross-examination, Mr. Scholl testified that had been practicing law for fifteen years in Shelby County and that, during this time, he had tried "upwards of sixty or more" capital cases. Of these sixty cases, Mr. Scholl went to trial on about fifteen of them. Of the fifteen cases that went to trial, Petitioner's case was the only one which resulted in a verdict of death.

Mr. Scholl stated that the victim James Day testified during an earlier federal trial. He added that, while in the courtroom, one witness identified Petitioner as the perpetrator in the courtroom. He explained that this witness was actually a witness for the defense. Mr. Scholl further stated that he presented witnesses to establish a relationship between Ms. Jackson and Mr. Jackson. Mr. Scholl also elicited identifications that implicated Co-defendant Bond as the shooter.

Mr. Scholl testified that he contacted Dr. Steinberg to evaluate Petitioner for any possible mental problems. He stated that Dr. Steinberg concluded that Petitioner was anti-social and predisposed to committing crimes. Mr. Scholl opined that this information was not beneficial. Mr. Scholl stated that he would do anything he could to get Petitioner off death row, but he would not lie.

13

Lorna McClusky sat as second chair for Co-defendant Bond. Ms. McClusky stated that she was in charge of mitigation for Co-defendant Bond. She stated that she employed Inquisitor Inc., specifically Glori Shettles, as a mitigation expert. Ms. McClusky stated that the trial was very stressful, and she lost over twenty pounds during the course of the representation. She recalled that there were fingerprints on the getaway car. Moreover, her client had previously confessed to being involved in the incident. In this regard, she knew to prepare for the penalty phase. Notwithstanding, their prepared defense for the guilt phase rested on the causation of Mr. Day's death. Their defense was that the bacteria which eventually resulted in Mr. Day's death entered his body in a manner unrelated to and not precipitated by the gunshot wound.

Barry Brown testified that he grew up with Petitioner and has known him for about twenty years. He testified that Petitioner had been married to Ms. Jackson. Mr. Brown had dated Ms. Jackson for a brief period in 1996 or 1997. He explained that he ended the relationship because Ms. Jackson was "too possessive." He explained that, when he ended the relationship, Ms. Jackson "threatened to get me back for quitting her." He conceded that Ms. Jackson never acted out on her threat against him in retaliation. Mr. Brown testified that he was aware that Ms. Jackson had also dated Mr. Jackson. Mr. Jackson also went by the name "Bobby Knot," "Knothead," or just by "Knot." Mr. Brown recalled that Ms. Jackson dated Mr. Jackson and Petitioner at about the same time. Mr. Brown stated that he knew nothing about the Walgreens robbery and was never contacted regarding the crime until recently. Mr. Brown explained that, at the time of the trial, he was incarcerated. On cross-examination, Mr. Brown stated that he also used the aliases of Ronald Cox, Kevin Durham, and William Upchurch.

Tonya Gentry testified that she has known Petitioner for about fourteen or fifteen years. Ms. Gentry stated that she knew Ms. Jackson as well. Ms. Gentry related that she was aware that Ms. Jackson had dated "some guy with a bump on his head. They called him 'Knothead.'" When asked if his name was "Mr. Jackson," Ms. Gentry replied, "Yeah. They mostly called him 'Knothead'. She explained that Ms. Jackson and 'Knothead' dated while Ms. Jackson was married to Petitioner, "'94 or '95 something like – no probably '93, '94 . . . I'm not – It was in the 90s." In response to questioning by the court, Ms. Gentry explained that Ms. Jackson dated Mr. Jackson after Petitioner was in jail. Ms. Gentry stated that she was on probation for theft of property.

Stephanie Williams, Petitioner's cousin, testified that she graduated from Booker T. Washington High School in 1987. She stated that she knew Mr. Jackson. She explained that

14

Mr. Jackson was also known as "Bobby Knot." Ms. Williams explained that she, Mr. Jackson, and Ms. Jackson all went to the same high school together. She stated that she and Ms. Jackson were friends. Ms. Williams testified that Ms. Jackson and Mr. Jackson were dating in 1997. She added that this may have occurred prior to Petitioner and Ms. Jackson getting married. Ms. Williams added that Ms. Jackson dated Mr. Jackson again after Petitioner was incarcerated.

Mr. Jackson testified that he was also known as "Bobby Knot" and "Knot." He stated that he attended Booker T. Washington High School in Memphis and graduated in 1984. Mr. Jackson stated that he had previously been incarcerated for an armed robbery that occurred in July 1997. He explained that this armed robbery occurred at the Southbrook Mall in Memphis. Mr. Jackson related that he and Terrance Lawrence discussed their plans for the robbery days before its commission. He stated that the robbery was Mr. Lawrence's idea. During the robbery of the Loomis armored car, gunfire was exchanged and both Mr. Jackson and the security guard were shot. Mr. Jackson stated that he gained no money from the robbery. He was later arrested by police at his mother's house. Mr. Jackson informed law enforcement officials that Mr. Lawrence was his accomplice. Mr. Jackson entered a guilty plea and received a sentence of five and one-half years.

Mr. Jackson testified that he was never questioned by law enforcement officials about the Walgreens robbery occurring on April 21, 1997. He was unaware that a witness to the Walgreens robbery had identified him as the driver of the getaway car. Mr. Jackson stated that he was never contacted by Mr. Scholl or Mr. Glatstein.

Mr. Jackson denied knowing a person or persons named "Courtney Jackson," "Coco Jackson," "Ms. Jackson," "Angie Jackson," "Barry Brown," "Barry Cox," or "William Upchurch." Mr. Jackson stated he did know a Bill Upchurch and a Stephanie Williams. Mr. Jackson stated that he did not know anyone named "Bowlegs," "Andrew Thomas," or "Anthony Bond."

Mr. Lawrence's testimony was introduced by deposition. Mr. Lawrence stated that he is currently incarcerated for the robbery at the Southbrook Mall of a Loomis Fargo armored car. For this offense, Mr. Lawrence received a sentence of seventeen and one-half years in federal prison. He stated that Mr. Jackson was his accomplice in the robbery and that he had known Mr. Jackson five years prior to the robbery. He stated that the robbery was Mr. Jackson's idea. He explained that Mr. Jackson had approached him in May 1997 about the possibility of robbing a Loomis Fargo armored car. Mr. Lawrence did not agree to the robbery until June. The robbery was planned a week in advance, and the plan was to intercept the armored car guard and produce a weapon and ask the armored car guard to give them the money. Mr.

15

Lawrence stated that, at no time, was he ever questioned about the April 21, 1997, Walgreens robbery.

Tanya Monger stated that she and Co-defendant Bond dated one another in 1996. She described Co-defendant Bond as nice and not violent, although she had seen him with guns. Ms. Monger stated that she knew Petitioner through Co-defendant Bond. She did not know Ms. Jackson.

Ms. Monger was questioned by detectives and FBI agents regarding the April 21, 1997, Walgreens robbery. She initially told police that she knew nothing of the robbery. After being told she could be charged with a criminal offense, Ms. Monger told the police that Co-defendant Bond committed the Walgreens robbery with Petitioner. Specifically, she informed law enforcement that Andrew Thomas was the shooter. Ms. Monger testified that she had gotten this information from overhearing the detectives. Ms. Monger admitted that, on November 5, 1997, she provided a statement to detectives regarding the Walgreens robbery. In this statement, Ms. Monger provided details of events occurring after the robbery. Specifically, Ms. Monger related how Co-defendant Bond had told her that he was going to buy a car and that he needed to put the car in her name. She also had observed Co-defendant Bond with "a big ball of money." Her statement further related:

> He said that he and Bowlegs had stolen a car. He said that Bowlegs was in his girlfriend's little red car. They drove it and parked it. They both got into the stolen car and started following an armored truck. When it stopped, a man got out and opened the truck. He said Bowleg [sic] walked up and shot the man. He said Bowleg [sic] grabbed the money and got back in the car and Anthony drove them back to the red car . . . .

Ms. Monger testified that the "he" in her statement was Co-defendant Bond and that "Bowleg" was Petitioner Andrew Thomas. Ms. Monger testified that she got this information from overhearing the detectives talking. Ms. Monger stated that she gave this statement of her own free will. She stated that she was not coerced by the police, however she felt that she would not have been let go unless she provided the statement.

Ms. Monger stated that this was the fourth time that she had been called to testify about the Walgreens robbery. She explained that she did not testify as to what was contained in the statement at the federal trial because what was contained in her statement was not true. At

16

the state trial, Ms. Monger testified against Petitioner, but she did not testify as to what was in the statement. Ms. Monger stated that, had she not overheard the detectives, she would not have given the statement.

On cross-examination, Ms. Monger again confirmed that, at the state trial, she was not asked whether Co-defendant Bond had told her that Mr. Thomas "pulled the trigger." However, Ms. Monger conceded that she was asked about the vehicle bought at McClain Motors, who was with her when she purchased the vehicle, and who paid for the vehicle. She also conceded that, on April 21, 1997, she saw Co-defendant Bond with a "big wad of cash," and the two of them, along with Treveous Garrett, went to Southland Mall and went shopping. Ms. Monger stated that Co-defendant Bond paid for all the purchases. Ms. Monger further admitted that she was aware that, on April 22, 1997, Co-defendant Bond went to the dentist and got four gold teeth. Ms. Monger testified that Petitioner bought a new purple car and that Co-defendant Bond purchased his car at McClain Motors at the same time. Ms. Monger conceded that everything in the statement regarding her interaction with Co-defendant Bond was true. She explained that the only part that she overheard from the officers was regarding the armored truck and the shooting. She added that she never asked Co-defendant Bond where he got the "wad of money."

Ms. Jackson testified that she was once married to Petitioner. She stated that she attended Booker T. Washington High School from 1984 to 1988.

Ms. Jackson testified that, at some time in 1997, numerous FBI agents came to her home and questioned her about the April 21, 1997 Walgreens robbery. She stated that the FBI agents wanted to know what she knew about the robbery and also showed her some pictures. Ms. Jackson identified Petitioner and Co-defendant Bond from the photographs. Regarding the robbery, Ms. Jackson told the agents that:

> I was home sick the day that it happened, and I heard a bang at the door, a knock at the door, and it was Andrew at the door, and he asked me, you know, what took me so long to get to the door.
>
> . . . .
>
> And once I opened the door, he came inside. Anthony was behind him, and Anthony threw some envelopes on the floor.

17

. . . .

. . . And then they started to open up the envelopes and taking money out of [them], and the envelopes that had checks and food stamps in it Andrew told me to throw away.

. . . .

. . . and then I recall them splitting the money.

. . . .

Then Andrew told Anthony to take the gun with him and to get rid of it, and Anthony had told me that this was a secret. I couldn't tell nobody what had happened.

. . . .

Then Anthony left the house and Andrew told me and kids to get ready to leave that the car was hot, and we went to go look for a car for him.

. . . .

I followed Andrew . . . to a car place, car lot.

. . . .

After we purchased the car, I remember us going to a hotel. We took the car back to the house, and he said we had to leave the car there because it was hot. So we went to a hotel and stayed there.

18

Ms Jackson stated that, during this entire time with Petitioner, she was scared. Ms. Jackson stated that the car Petitioner was describing as "hot" was her red Suzuki Swift. She explained that "hot" meant that "[s]omething done happen in it hot." Ms. Jackson recalled speaking with prosecutors but could not recall if they were state or federal.

As to her identification of Petitioner from the photograph shown her by the federal agents, Ms. Jackson explained that, although she could not see his face, she knew his body. She also recognized his clothing. At Petitioner's trial, Ms. Jackson testified that, on April 21, 1997, Petitioner was wearing a striped shirt, shorts and a hat.

Ms. Jackson stated that she did not know a person or persons named "Courtney Jackson," "Coco Jackson," "Mr. Jackson," "Bobby Lee Jackson," or "Bobby Knot." Ms. Jackson stated that she had a brother, Courtney Williams, and that he sometimes went by the name "Coco." She could not recall admitting previously that she knew Mr. Jackson. After being shown a photograph of Mr. Jackson, Ms. Jackson stated that "[i]t look like he may have grew up in the apartments that we stayed in, but I don't know him personally, no." She stated that she had never dated Mr. Jackson.

Ms. Jackson testified that she had previously dated Barry Brown. She recalled him being "something like a high school sweetheart." She denied ever telling him that she would get even with him for breaking up with her.

On cross-examination, Ms. Jackson stated that, on April 21, 1997, Petitioner was unemployed. Petitioner had told her previously that he was "going to get that money." She explained that Petitioner had made these comments when they would "be in the car behind [an armored truck.]" Ms. Jackson testified that, while at the hotel with Petitioner on April 21, 1997:

> The news was flashing about the armored truck man had been shot and that he struggle for his life, and that's when Andrew said they lying. He didn't struggle for his life that he shot him and Anthony was shaky, you know, mother fucker. That's what he said.

Ms. Jackson stated she did not contact the police. Ms. Jackson stated that she married Petitioner after the Walgreens robbery. She explained that she "felt that was the safest thing for me to do." Ms. Jackson stated that they were not married long.

19

Ms. Jackson denied the suggestion that she and Mr. Jackson had "ma[d]e up a story on Andrew Thomas." She stated that she had testified as to her recollection of the events of April 21, 1997, three times. Ms. Jackson stated that she was still scared of Petitioner.

Gail McDonald, through the assistance of an interpreter for the hearing-impaired, testified that she was at Walgreens on April 21, 1997, and witnessed the robbery of the armored truck. She related that she was in her car preparing to enter Walgreens when she observed a man run out with a gun and shoot the security officer. The shooter picked up a bag and ran away. Ms. McDonald testified that she witnessed the guard get shot in the back of the neck. At the time, she provided law enforcement officers a description of the people involved. Specifically, she described the driver as African-American, "a little heavyset, round face," and "had a full head of hair kind of an afro style at that time." She described the shooter as wearing "a white t-shirt, maybe a low cut v-neck or something . . . ." The other person was "wearing a kind of blue striped, thin stripes, [long-sleeved shirt] and then maybe some blue jeans, a cap, kind of had a facial hair around the mouth, but he had a real thin sullen type face." She also informed police that the men were in a white car. Ms. McDonald testified that she was never contacted by any of the lawyers for the defendants.

Dr. Steven Horowitz, a neurologist, testified that neurology is the clinical study of patients who have diseases of the nervous system. Dr. Horowitz was retained to testify regarding the injury to Mr. Day from the bullet wound and the subsequent neurological problems that he suffered until his death in 1999. Dr. Horowitz reviewed Mr. Day's April 21, 1997 hospital records, records from Health South Rehabilitation Center, intermittent records from Semmes-Murphey Neurological Clinic from 1997 through 1999, and records from Methodist Hospital from September 30 through October 2, 1999. He also had available for his review the depositions of Dr. Smith and Dr. Gardner, Ms. Day's deposition, and the autopsy report.

Dr. Horowitz related that Mr. Day was shot in the back of the head. He explained that the bullet did not enter the brain but caused a hemorrhage in the area called the posterior fossa. The posterior fossa contains the cerebellum, the brain stem and some spinal fluid. The bullet apparently damaged the occipital bone and caused a hemorrhage in the cerebellum. Dr. Horowitz stated that "for the first number of hours . . . [Mr. Day] was neurologically normal." He explained that, at the time he was admitted into the hospital, Mr. Day was able to move his lower extremities, was mentally alert, and was able to respond to commands. Later that evening, however, the nurses noted a change in Mr. Day's alertness level. A CAT scan showed something called hydrocephalus. Dr. Horowitz explained that

20

Mr. Day had a hemorrhage in the back of the brain that caused spinal fluid to back up enlarging the ventricular system. In common terms, this hydrocephalus is known as "water on the brain." When this occurs, the brain can "be forced through little small holes and there can be pressure on the brain stem . . . and the patient can die." Mr. Day's medical team recognized that this was a neurological emergency and called in the neurological resident at 12:45 a.m. The resident put in a "shunt, a ventriculostomy. . . ." Dr. Horowitz explained that a hole was drilled into the skull, and a tube was placed into the ventricles to drain off the spinal fluid so that it would not compress the brain. At 4:30 a.m., Mr. Day was taken into the operating room, and the medical team operated on the back of the brain to drain the hematoma. At this time, they took out the "bony, bone shards that had entered into that area, and they took out the bullet which had never been in the brain." Dr. Horowitz reported that, it was not until some point after the surgery, when Mr. Day experienced the inability to move his lower extremities.

Mr. Day was released from The Med at the end of May and was admitted to Health South Rehabilitation Facility. Mr. Day was at Health South for four or five weeks. Two years after the incident, in 1999, Mr. Day became quite ill and was taken to Methodist Hospital. The medical team found bleeding in multiple areas. Mr. Day had blood in his urine. The medical team operated and found that Mr. Day had a ruptured bladder; an abdominal infection called peritonitis; sepsis, which is a generalized infection of the body; and diabetic ketoacidosis, which is uncontrollable diabetes. Mr. Day passed away on October 2, 1999.

Dr. Horowitz restated that on April 21, 1997, when he was admitted to The Med, Mr. Day did not have a paralysis of any of his extremities. Dr. Horowitz further stated that Mr. Day did not have focal neurological deficits. He explained that a focal neurological deficit would indicate that there was a specific injury to a specific part of the nervous system. The medical team did not notice that Mr. Day was paralyzed until around 2:15 p.m. when there was a nurse's note indicating that Mr. Day was not moving his legs as well as he was moving his arms. A notation at 6:30 p.m. reflected that Mr. Day was not moving his legs at all.

Dr. Horowitz reviewed Dr. Smith's deposition and testified as follows:

> Dr. Smith thought that Mr. Day died of a ruptured bladder, generalized sepsis, peritonitis, which is the infection of the lining of the abdomen, and he thought that the ruptured bladder was due to the bladder dysfunction, which we call a neurogenic bladder, that arose from the spinal cord injury, and the spinal cord injury was caused by the gunshot wound because the gunshot wound produced hypotension and

21

made the spine -- and caused the stroke in the spinal cord.

Dr. Horowitz stated that hypotension is low blood pressure. He explained that normal blood pressure is 120 over 80. He explained that hypertension is higher than 140 over 90. Hypotension, he explained, is harder to define because many people get along on relatively low blood pressure like 110 over 60 with no symptoms. Dr. Smith's testimony was based on the fact that low blood pressure caused a stroke in the spinal cord which caused the bladder problems that eventually led to Mr. Day's death.

Dr. Horowitz also reviewed Dr. Gardner's testimony regarding Mr. Day's death. Dr. Gardner essentially agreed with Dr. Smith's conclusion. Dr. Gardner used the word "Shock," which is an extremely low blood pressure. Dr. Gardner concluded that the gunshot wound caused shock. The shock caused the spinal cord injury. The spinal cord injury caused the neurogenic bladder, and the rupture of neurogenic bladder caused his demise. Dr. Horowitz concluded that Dr. Gardner and Dr. Smith "have the same basic scenario."

Dr. Horowitz did not agree with Dr. Gardner's and Dr. Smith's conclusions as to the cause of Mr. Day's death. First, Dr. Horowitz stated that, upon his admission to The Med, Mr. Day was hypertensive, *i.e.*, he had high blood pressure. Dr. Horowitz stated that, normally, you would want to treat the high blood pressure. However, in a situation where there is an intra-cerebral bleed, a question arises as to when the blood pressure should be treated. He explained that if the blood pressure went too high, the bleeding would continue. He continued that if the blood pressure went too low, the arteries can not perfuse the brain when the pressure in the brain is increased. Dr. Horowitz stated that you wanted enough blood into the brain so that a stroke does not form but not so much that the bleeding continues. Dr. Horowitz explained that he would not treat a blood pressure that was less than 185 over 110. He added that the current recommendation by the American Heart Association is to have blood pressure of 160 over 90. Dr. Horowitz stated that Mr. Day had a blood pressure of about 178 over 120, 180 over 110. He stated that he would not be aggressive in treating this. The medical team in charge, however, "were very aggressive." Dr. Horowitz reported that "over the course of the next twenty-four or more, thirty-six hours they gave him six different major antihypertensive agents to knock his blood pressure down, and they gave them all intravenously or intramuscularly or subcutaneously or they put a patch on." He explained that Mr. Day was being treated with multiple antihypertensive agents at once, which was not the standard of care. He disagreed with the aggressive treatment by the medical team of Mr. Day's hypertensive condition. Dr. Horowitz further commented that Mr. Day never went into shock because his pulse rate would "have been off the chart." He stated that Mr. Day's "pulse rate was in the normal range all through here." He surmised that

22

Mr. Day's low blood pressure was the result of five antihypertensive agents all during those hours late in the day of April 21 through the day of April 22.

Dr. Horowitz stated that the gunshot wound did not cause Mr. Day's hypotension or shock. He thus concluded that "there was no connection between the bullet wound and Mr. Day's subsequent neurological deficits and ultimate death." Dr. Horowitz was of the opinion that the low blood pressure was caused by the treatment of the high blood pressure.

Dr. Horowitz also addressed Dr. Smith's and Dr. Gardner's shared hypothesis that a lesion on the spinal cord was caused by a stroke. Dr. Horowitz stated that there is no proof of a stroke. He further noted that, despite performing the autopsy, neither Dr. Smith nor Dr. Gardner examined the spinal cord. Dr. Horowitz was unable, however, to exclude the possibility that there was a stroke. He qualified this statement by stating that, if it was a stroke that caused the lesion on the spine, it was a result of the aggressive treatment with hypertensive agents. Dr. Horowitz testified that in January 1998 an MRI of the thoracic spine was repeated and revealed a cord lesion at T4. He stated that the lesion had the appearance of a central cord lesion similar to a syrinx, a cyst. He stated that a syrinx could be congenital. However, he ruled this out in Mr. Day's case as he had no neurological deficits earlier in life. Dr. Horowitz also acknowledged that trauma could cause a reaction in the spinal cord called necrosis. He ruled this out because there was no fracture of any of the bones protecting the spinal canal and there was no hematoma in the area. He next suggested that the syrinx could be a tumor. However, he stated that there was no evidence of a tumor. Finally, he stated that it was possible that the syrinx is "an infarction which is a sign that there was a stroke of the spinal cord." He explained that this was the basis of Dr. Smith's and Dr. Gardner's hypothesis, however, he stated there was no proof that this was the case. Dr. Horowitz conceded that there was no proof of any of the four causes for the syrinx.

Regarding Mr. Day's cause of death, Dr. Horowitz testified that Mr. Day was diabetic. He added that Mr. Day was given too much of the anticoagulant drug Cumadin so that he was Cumadin toxic. Dr. Horowitz explained that diabetes is diagnosed by finding an elevated blood sugar when testing the blood. Sugar can also be found by completing a urine analysis. Blood sugar should be 99 or less than 100. If it is over 126, "it's considered to be frank diabetes." If it is between 100 and 125, it is thought to be impaired glucose tolerance, a precursor of diabetes. Dr. Horowitz reported that upon Mr. Day's admission to the hospital in 1999 his blood sugar was 699. Dr. Horowitz explained that "[Mr. Day had] terrible diabetes, plus, he had severe metabolic acidosis meaning that the glucose was not being broken down, and the body was reacting negatively, and it's a medical emergency to have

23

a blood sugar that high, and it's called diabetic ketoacidosis, and it's a life threatening condition." He related that the hospital records indicated that Mr. Day was a newly diagnosed diabetic but was not treated. Dr. Horowitz added that Mr. Day's hospital records from 1997 also indicated that he was diabetic at that time. Specifically, he referenced glucose levels of 178, 126, 143, 116, 148, 126, and 122. Dr. Horowitz explained that these levels could have been caused by the stress of the bullet, the surgery, and the fact that he was being given intravenous medications. Dr. Horowitz stated that Mr. Day's blood sugar was also high as reported on reports from his time at the rehabilitation center. Dr. Horowitz stated that there was convincing evidence that Mr. Day was a diabetic way out of control in April 1999. He stated that a person with diabetes is more susceptible to infection, and the risk of infection is greater if the diabetes is left untreated. Dr. Horowitz concluded that diabetes definitely contributed to Mr. Day's death.

Dr. Horowitz testified that on the day Mr. Day was admitted to Methodist Hospital in September 1999, Mr. Day was septic, meaning he had an overwhelming infection. Mr. Day also had diabetic ketoacidosis, which affects a whole host of systems including his neurology system. He explained that the two conditions together were cyclical, *i.e.*, the infection made the diabetes worse and the diabetes made the infection worse.

Dr. Horowitz also noted that Mr. Day was at risk for thrombophlebitis in his legs because he was paralyzed. Mr. Day was constantly seated in a wheelchair or in a bed and, therefore, was at increased risk for thrombophlebitis in his legs, meaning that a blood clot would form. When a blood clot formed, there was a possibility that it could break off and go to the lungs as a pulmonary embolism and cause him to stop breathing. Mr. Day had an attack of thrombophlebitis when he was in The Med. Mr. Day was treated with Cumadin. When he was admitted to Methodist Hospital, his blood was way too thin. Dr. Horowitz opined that "[s]omebody had not managed his Cumadin correctly earlier . . . ." Upon admission to Methodist Hospital, Mr. Day had blood in his urine and clots in his bladder. He also had "a liter of blood in his abdomen." At the autopsy, Dr. Gardner and Dr. Smith observed bleeding around his eyes and his nose, bleeding around his heart, and bleeding into the lining of the abdomen. Dr. Horowitz concluded that Mr. Day was over anti-coagulated.

Dr. Horowitz concluded that, based upon his experience, Mr. Day did not experience hypotension or go into shock on April 21 or 22, 1997. He stated that, in his medical opinion, the gunshot wound did not cause Mr. Day's paralysis. He concluded that the gunshot wound did not cause Mr. Day's death on October 2, 1999. Dr. Horowitz concluded that Mr. Day's cause of death was "[a]n overwhelming infection, uncontrollable diabetes with the state of diabetic ketoacidosis and an inability to clot because of the Cumadin toxicity."

24

On cross-examination, Dr. Horowitz conceded that the fact that Mr. Day had diabetes was brought out at trial, including the glucose reading of 699 at the time of his September 1999 hospital admission. Dr. Horowitz conceded that had Mr. Day not been shot at the Walgreens on April 21, 1997, there would have been no reason for him to die on October 2, 1999. On re-direct, Dr. Horowitz explained that the gunshot wound did not cause his paralysis, did not cause his spinal cord injury, did not cause his infection, and did not cause his death on October 2, 1999.

On August 4, 2008, the post-conviction court entered a written order denying relief as to all issues raised by Petitioner. Petitioner subsequently filed a timely notice of appeal.

### Standard of Review for Post-Conviction Cases

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. T.C.A §. 40-30-103. The petition challenging Petitioner's conviction is governed by the 1995 Post-Conviction Act, which requires that allegations be proven by clear and convincing evidence. *See* T.C.A. § 40-30-110(f). Evidence is clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from the evidence. *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

Once the post-conviction court has ruled upon a petition, its findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. *Wallace v. State*, 121 S.W.3d 652, 656 (Tenn. 2003); *State v. Nichols*, 90 S.W.3d 576, 586 (Tenn. 2002) (citing *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999)). This Court may not reweigh or reevaluate the evidence or substitute its inference for those drawn by the post-conviction court. *Nichols*, 90 S.W.3d at 586. Questions concerning the credibility of witnesses and the weight to be given their testimony are for resolution by the post-conviction court. *Id*. (citing *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997), *reh'g denied*, (1998), *cert. denied*, 525 U.S. 830, 119 S. Ct. 82 (1998)). It is, therefore, the burden of Petitioner to show that the evidence preponderated against those findings. *Clenny v. State*, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978).

Notwithstanding, determinations of whether counsel provided a defendant constitutionally deficient assistance present mixed questions of law and fact. *Wallace*, 121 S.W.3d at 656; *Nichols*, 90 S.W.3d at 586. As such, the findings of fact are reviewed under a de novo

25

standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001) (citations omitted). In clarifying the standard, our supreme court explained that the standard for reviewing the factual findings of a trial court has always been in accordance with the requirements of the Tennessee Rules of Appellate Procedure, specifically Rule 13(d). *Fields*, 40 S.W.3d at 456.

## I.  Ineffective Assistance of Counsel
### A.  Standard of Review

The Sixth Amendment provides, in pertinent part, that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI.  This right to counsel is "so fundamental and essential to a fair trial, and so, to due process of law, that it is made obligatory upon the States by the Fourteenth Amendment.'" *Gideon v. Wainwright,* 372 U.S. 335, 340, 83 S. Ct. 792, 794 (1963) (quoting *Betts v. Brady,* 316 U.S. 455, 465, 62 S. Ct. 1252, 1257 (1942)).  Inherent in the right to counsel is the right to effective assistance of counsel. *Cuyler v. Sullivan,* 446 U.S. 335, 344, 100 S. Ct. 1708, 1716 (1980); *McMann v. Richardson,* 397 U.S. 759, 771 n.14, 90 S. Ct. 1441, 1449 n.14 (1970); *see also Strickland v. Washington,* 466 U.S. 668, 686, 104 S. Ct. 2052, 2063 (1984).

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, the petitioner bears the burden of showing that (a) the services rendered by trial counsel were deficient and (b) that the deficient performance was prejudicial. *See Powers v. State*, 942 S.W.2d 551, 558 (Tenn. Crim. App. 1996).  In order to demonstrate deficient performance, the petitioner must show that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975).  In order to demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984).  "Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley*, 960 S.W.2d at 580.

The performance prong of the *Strickland* test requires a petitioner raising a claim of ineffectiveness to show that counsel's representation fell below an objective standard of

reasonableness, or "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066; *see also Kimmelman v. Morrison*, 477 U.S. 365, 386, 106 S. Ct. 2574, 2588 (1986). Furthermore, on claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight. *See Adkins*, 911 S.W.2d at 347. This Court may not second-guess a reasonably based trial strategy, and we cannot grant relief based on a sound, but unsuccessful, tactical decision made during the course of the proceedings. *See id.* However, such deference to the tactical decisions of counsel applies only if counsel makes those decisions after adequate preparation for the case. *See Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). When reviewing claims of ineffective assistance of counsel, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged actions 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. (citing *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S. Ct. 158, 164 (1955)). Additionally, courts should defer to trial strategy or tactical choices if they are informed ones based upon adequate preparation. *See Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). Finally, it is acknowledged that criminal defendants are "not entitled to perfect representation, only constitutionally adequate representation." *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794, 107 S. Ct. 3114, 3126 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, n.38, 104 S. Ct. 2039, 2050 n.38 (1984)). Notwithstanding, it is the duty of this Court "to search for constitutional [deficiencies] with painstaking care" as this responsibility "is never more exacting than it is in a capital case." *Id.* at 785, 107 S. Ct. at 3121.

## B. Guilt Phase Deficiencies

Petitioner claims that trial counsel failed to function as effective counsel as guaranteed by both the Tennessee and United States Constitutions. In this regard, Petitioner asserts that counsel denied him effective representation of counsel by breaching acceptable standards for capital representation at the guilt phase in that:

1. Trial counsel failed to adequately respond to the introduction of Co-defendant Bond's confession.

2. Trial counsel failed to present a medical causation defense & failed to adequately cross-examine the State's medical witnesses.

3. Trial counsel failed to object to the prosecution's use of "greed and evil."

4. Co-counsel rendered ineffective assistance of counsel.

5. Trial counsel failed to introduce evidence that Mr. Jackson committed the crime.

6. Trial counsel's cumulative errors amounted to ineffective representation.

## 1. Response to the introduction of Co-defendant Bond's confession.

Petitioner argues that trial counsel provided ineffective assistance of counsel when he failed to object to the introduction of Co-defendant Bond's redacted confession, failed to object to the reference to the redacted confession in summation; failed to request a limiting instruction; and failed to object to the decision to include a description of the clothing.

Petitioner complains that his right to confrontation under the Sixth Amendment was violated by the trial court's admission of Co-defendant Bond's redacted statement. He argues that the redacted statement facially implicated him in that: (1) the physical condition of the confession was such that the jury, which received a copy of the confession to review during its deliberations, could tell that the confession had been altered because the State redacted it by replacing text with big blocks of empty, white space and by replacing certain typewritten words, including Petitioner's nickname, with different handwritten words; (2) the trial court informed the jury that Co-defendant Bond had one accomplice, referred to in handwriting as "the other person," who was the shooter in the Walgreens robbery, supporting the State's theory of the case that Petitioner, Bond's co-defendant, was the shooter; and (3) the redacted statement contained a description of what the shooter was wearing during the Walgreens robbery, even though such information was unquestionably irrelevant to Co-defendant Bond, allowing the State to tie Co-defendant Bond's description of the shooter's clothing directly to testimony given by the State's key witness, Ms. Jackson, of what Petitioner was wearing on the day of the Walgreens robbery.

### a. Post-Conviction Court's Findings of Fact and Conclusions of Law

The post-conviction court entered the following findings of fact and conclusions of law:

[T]he State sought to introduce Bond's federal trial testimony during

28

the state court proceeding. They indicated that they felt the federal testimony was "better than the confession" because the confession was brief and left out many of the details that the federal testimony included. Petitioner objected and the court granted counsel's request for a severance. Approximately, one month prior to trial, the State informed counsel and the court that they would not be using Bond's federal testimony; but, instead proposed using a redacted version of Bond's two page confession. Bond's counsel objected to the joinder. While, petitioner's counsel did not object to the joinder, they did ask that additional redactions be made to the statement. The court held that joinder was appropriate; but, found additional redactions relating to the details of the offense were required. In its' final form, the pertinent portions of [Bond's] redacted statement read as follows:

Q:      On Monday April 21, 1997, at about 12:36 p.m. did you participate in a robbery of a Loomis Wells Fargo Armored car which was making a pick up at Walgreens at 4522 Summer, Memphis, TN?

A:      Yes.

Q:      Was there anybody injured during this robbery?

A:      Yes, dude that worked for Wells Fargo, he got shot.

Q:      Where was Loomis guard shot at on his body?

A:      In the head.

Q:      Describe the gun the guard was shot with.

A:      A revolver, chrome, it was little with a short barrel.

Q:      Were you armed during the robbery?

A:      No.

Q:      What did you drive during the robbery?

A:      Drive the getaway car. A white Pontiac Bonneville, four door.

Q:      When was this robbery planned?

A:      The day before.

Q:      What were you wearing during the robbery?

A: Jeans and a blue, long sleeved shirt.

Q: What was **the other person** wearing during the robbery?

A: A striped shirt, I think it was yellow and blue. And he might have had some shorts on.

Q: How much money was taken in the robbery?

A: About $14,000 or $15,000 cash I guess, I don't remember exactly. And some checks and food stamps were in there.

Q: How much of this money did you get?

A: About $6,000 or $7,000.

Q: Do you know where the pistol that was used is now?

A: No.

Q: What was the money and checks in when it was taken from the guard?

A: A brown bag.

Q: What did you do with the money you received from this robbery?

A: Bought a car, a white four door 1990 Chevrolet Caprice, for $4800 from McClain Motors on Elvis Presley and blew the rest.

Q: Who was with you when the car was purchased?

A: My girlfriend, Tonya Monger, she put the car in her name.

Q: Did you have on a yellow and blue jacket?

A: Yes, I had one.

Q: What happened to the yellow and blue jacket?

A: It was threw [sic] away with the other stuff.

Q: What was your hairstyle like at the time of the robbery?

A: A long jerri curl.

The post-conviction court concluded that Petitioner's counsel should have objected to the State's use of Co-defendant Bond's redacted confession, should have requested a limiting instruction and should have challenged the State's use of the statement on direct appeal. However, the post-conviction court also determined that Petitioner was unable to demonstrate that counsel's omissions resulted in prejudice because it was likely that any error in the admission of the redacted statement would have been found harmless. In making this conclusion, the post-conviction court found that "the offending portion of Bond's statement amounts to one question and answer," *i.e.*, "what was the other person wearing during the robbery;" and "a striped shirt, I think it was yellow and blue," and "he might have had some shorts on." The lower court determined that, even absent Co-defendant Bond's statement, Ms. Jackson's testimony was extremely strong evidence that was independently corroborated by other evidence at trial. The court determined that Jackson's testimony "was proof that did not relate to or depend in anyway upon Bond's redacted confession." The post-conviction court further accredited counsel's testimony that "his choice to include the description provided by Bond of the 'other person' was strategic." The court found that "[t]he fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation." The court found counsel's tactical choices informed and based upon adequate preparation.[4]

## b. Analysis

### i. *Bruton* Error

The Confrontation Clause of the Sixth Amendment to the United States Constitution states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend. VI. This constitutional guarantee is applicable to the states via the Fourteenth Amendment. *Pointer v. Texas,* 380 U.S. 400, 403-06, 85 S. Ct. 1065, 1067-70 (1965). The Confrontation Clause bars the admission of out-of-court, testimonial statements made by a witness who is unavailable to testify at trial and has not been subject to cross-examination on the same issue by the defendant in the past. *Davis v. Washington,* 547 U.S. 813, 821, 126 S. Ct. 2266, 2273 (2006) (citing *Crawford v. Washington,* 541 U.S. 36, 53-54, 124 S. Ct. 1354, 1365-1366 (2004)). In *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620 (1968), the United States Supreme Court held that where two defendants are jointly tried, admission of one defendant's pre-trial

---

[4] The post-conviction court also considered the reliability and admissibility of Co-defendant Bond's confession in light of *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531 (1980), and *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354 (2004). However, Petitioner states in his brief that these cases are not applicable to his case and makes no argument regarding the post-conviction court's findings under these cases. Therefore, we will not address the reliability of the confession under *Roberts* and *Crawford*.

statement implicating the co-defendant violates the co-defendant's Sixth Amendment right to confront and cross-examine witnesses against him.

To determine whether Petitioner was afforded ineffective assistance of counsel with regard to the introduction of the redacted confession, we must first determine whether Petitioner's right of confrontation under the Sixth Amendment has been violated. In *Bruton,* the United States Supreme Court reversed a defendant's conviction because the introduction of a non-testifying co-defendant's confession implicating the defendant violated the defendant's right to confront the witnesses against him in contravention of the Confrontation Clause of the Sixth Amendment to the United States Constitution. The confession added "substantial, perhaps even critical, weight to the Government's case in a form not subject to cross-examination, since [the co-defendant] did not take the stand. [The defendant] was thus denied his constitutional right of confrontation." *Bruton,* 391 U.S. at 128, 88 S. Ct. at 1623. The Court also doubted that a curative instruction would alleviate the prejudice and concluded that the risk that the jury may not follow such an instruction is too great. "[W]e cannot accept limiting instructions as an adequate substitute for [the defendant's] constitutional right of cross-examination. The effect is the same as if there had been no instruction at all." *Id.* at 137, 88 S. Ct. 1628.

The *Bruton* rule was subsequently limited by *Richardson v. Marsh,* 481 U.S. 200, 107 S. Ct. 1702 (1987). In *Richardson,* the Court held that "the Confrontation Clause is not violated by the admission of a non-testifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Id.* at 211, 107 S. Ct. at 1709. The Court specifically declined to consider at that time the admissibility of a confession in which the defendant's name "has been replaced with a symbol or neutral pronoun." *Id.* at 211 n.5, 107 S. Ct. at 1709 n.5.

The question of whether the use of a symbol or neutral pronoun would violate the *Bruton* rule was resolved in *Gray v. Maryland,* 523 U.S. 185, 118 S. Ct. 1151 (1998). In *Gray,* a non-testifying co-defendant's confession was redacted by substituting the word "deleted" or "deletion" each time Gray's name appeared. The Supreme Court held that such a redacted confession was within the class of statements protected by *Bruton* and that the non-confessing defendant's name could not be replaced with an obvious blank space, a word such as "deleted," a symbol, or other similarly conspicuous type of alteration. *Gray*, 523 U.S. at 192, 1185 S. Ct. at 1155. Because the redacted confession still "refer[red] directly to the 'existence' of the non-confessing defendant" and incriminated him, the Court held that it fell within the *Bruton* rule.

In the present case, the redacted statement substituted the words "the other person" in the place of "Bowlegs." In a similar factual situation, a panel of this Court, in *White v. State*, 497 S.W.2d 751 (Tenn. Crim. App. 1973), held that "[t]o assume . . . that the insertion of 'the other person' cured any possible prejudice to one of the co-defendants would be legal sophistry." 497 S.W.2d at 755. This Court noted "that a statement of the confessing co-defendant could only be used if completely stripped of any incriminating references to the non-confessor." *Id*. The Court held that the insertion of the words "the other person" does not fall within that standard. *Id*.; *see also Alexander v. State*, 562 S.W.2d 207, 209-10 (Tenn. Crim. App. 1977) (holding insertion of "my friend" in place of non-confessor's name insufficient to cure prejudice). As acknowledged by the post-conviction court, the law regarding redacted confessions under *Bruton* was in place well before Petitioner's trial. We can reach no conclusion other than that the redacted statement which replaced "Bowlegs" with "other person" violated the mandates of *Bruton* and its progeny. Moreover, the error is compounded by the fact that no limiting instruction was provided.

However, "Confrontation Clause errors are subject to harmless-error analysis." *Peterson v. Warren*, 311 Fed. Appx. 798, 803 (6th Cir. 2009) (quoting *Vasquez v. Jones*, 496 F.3d 564, 574 (6th Cir. 2007)). In determining whether a *Bruton* violation is harmless, a reviewing "court must decide 'whether the "minds of an average jury"' would have found the State's case against a defendant "significantly less persuasive"' had the incriminating portion of the co-defendant's statement been excluded." *Stanford v. Parker,* 266 F.3d 442, 456-457 (6th Cir. 2001) (quoting *Hodges v. Rose,* 570 F.2d 643, 648 (6th Cir. 1978) (quoting *Schneble v. Florida,* 405 U.S. 427, 432, 92 S. Ct. 1056, 1060 (1972)).

In this regard, the findings of the post-conviction court are supported by the record. The evidence of Petitioner's guilt, even absent the redacted statement, was overwhelming. Ms. Jackson testified that Petitioner confessed to her his involvement in the murder, including Petitioner's admission that he shot the victim. Moreover, Ms. Jackson has repeatedly testified as to how Petitioner and Co-defendant Bond appeared at her apartment with the proceeds of the robbery and their actions immediately afterwards. The post-conviction court noted that Ms. Jackson's testimony in this regard was supported by documentation showing that at least some of the purchases that she described did in fact occur. In addition, Ms. Jackson testified that she owned a red Suzuki Swift on April 21, 1997. She testified that on the morning of the Walgreens robbery, Petitioner left her apartment in her car. This testimony was corroborated by other witness accounts at trial. The post-conviction court properly concluded that this proof did not relate to or depend upon Co-defendant Bond's confession. We conclude that the jury would not have found the State's case significantly

less persuasive absent the introduction of the redacted statement of Co-defendant Bond. Accordingly, the error in admitting the statement was harmless beyond a reasonable doubt.

### ii. Counsel's Alleged Errors

The post-conviction court found:

> Although this court finds petitioner's counsel should have objected to the State's use of Bond's redacted confession at his trial; should have requested a limiting instruction regarding the jury's consideration of the statement; and should have challenged the State's use of the statement on appeal, because this court finds any error occurring at trial would likely have been found harmless, this court finds petitioner has failed to demonstrate he was prejudiced by counsel's inaction. . . .
>
> . . . .
>
> Clearly, *Gray* and *White* had been decided at the time of petitioner's trial and were directly applicable to the submitted redaction of Bond's confession. However, at the post-conviction hearing, petitioner's trial counsel testified that his choice to include the description provided by Bond of the "other person" was strategic. He testified that he specifically sought the inclusion of the description because it was at odds with descriptions of the shooter provided by other witnesses. The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. . . . Here, while the court questions counsel's choice, it does not find counsel's tactical choices were uninformed o[r] based on inadequate preparation. Thus, this court does not find petitioner received ineffective assistance of counsel in this regard. However, even [if] the court were to find counsel's performance deficient, because this court finds this error would likely have been deemed "harmless" on appeal, the court finds petitioner has failed to demonstrate he was prejudiced by counsel's tactical decisions.

(Citations omitted).

34

Mr. Scholl testified that his theory at trial was that the crime was committed by Co-defendant Bond and a third party. In this regard, "the other person" focused upon by Petitioner's defense was Mr. Jackson. Similarly, Mr. Scholl testified that he was adamant about leaving the description of the accomplice's clothing in the statement. He explained that there were various descriptions of what the second person was wearing. Mr. Scholl testified that the description in Co-defendant Bond's confession only served to amplify the inconsistencies in all of the descriptions. In this Court's opinion, there is no doubt that counsel made a strategic decision regarding the form and content of the redacted confession. Mr. Scholl's testimony evidences counsel's knowledge of the law, preparation, and sincere and conscious reflection and consideration of the best possible trial theory for Petitioner. Mr. Scholl's tactical decision was reasonable under the circumstances and does not demonstrate ineffective assistance of counsel. Petitioner does not overcome the presumption of reasonable performance or deference to tactical decisions of counsel in this claim. Notwithstanding, our deference to trial strategy does not extend to the failure to request a limiting instruction. We fathom no legitimate tactical reason to explain counsel's failure to request a limiting instruction. However, because we have determined that the *Bruton* error was harmless, Petitioner has failed to establish prejudice. Accordingly, Petitioner is not entitled to relief on this ground.

**2. Trial counsel failed to effectively present a medical causation defense and cross-examine the State's expert witnesses.**

Petitioner asserts that trial counsel failed to adequately present a defense against medical causation thereby depriving Petitioner of effective assistance of counsel. Specifically, Petitioner cites to three alleged errors: (1) trial counsel failed to present a single witness to challenge the State's medical cause even though the neurological evidence demonstrated that Mr. Day did not die as a result of the gunshot wound; (2) trial counsel failed to object to the cumulative testimony of or properly cross-examine the State's two medical witnesses, Dr. Smith and Dr. Gardner, with the key evidence contradicting their theory of causation; and (3) trial counsel improperly relied on his co-counsel with respect to the medical issues at the heart of the case.

**a. Post-Conviction Court's Findings**

The lower court's findings of fact and conclusions of law are summarized as follows. Dr. Smith and Dr. Gardner concluded that the victim's death was a direct result of the victim having suffering a gunshot wound to the head on April 21, 1997. The lower court

acknowledged that no contradicting testimony from a medical expert was offered at trial by the defense. Notwithstanding, the trial court also recognized that the State's medical experts were thoroughly cross-examined by defense counsel for both defendants. Indeed, the lower court noted that there were "[n]early one hundred pages of trial transcript . . . dedicated to the cross-examination of Dr. Smith." The court remarked that a similar lengthy cross-examination was made of Dr. Gardner. At the post-conviction hearing, Petitioner presented the testimony of Dr. Horowitz who concluded that the victim died as a result of an overwhelming infection, diabetic ketoacidosis, and Cumadin toxicity. Dr. Horowitz added that, had the victim been properly treated, he would not have developed paralysis which led to the complications that caused the victim's death.

The trial court reiterated the testimony of Petitioner's trial counsel, who stated that, as Co-defendant Bond admitted participation in the robbery, Co-defendant Bond's only defense was that of causation of death. In this regard, trial counsel permitted counsel for Co-defendant Bond to take the lead in cross-examining the expert medical witnesses. Trial counsel further stated that, because Petitioner's primary defense was that he was not involved in the robbery, he opined that it was difficult for him to claim that his client was not involved and then say, but if you think he was involved, here is an alternative defense. The lower court found that counsel for Co-defendant Bond thoroughly and extensively cross-examined the State's expert medical witnesses. The court found that counsel for Co-defendant Bond was "very prepared on the issue of causation and [found that Petitioner] received the benefit of that preparation." The lower court determined that counsel for Petitioner was not ineffective in allowing counsel for Co-defendant Bond to take the lead on this issue or in failing to ask essentially the same questions on cross-examination.

The lower court further determined that testimony in accordance with Dr. Horowitz's findings would not have substantially altered the jury's findings and that the failure to present such testimony did not prejudice Petitioner. In this regard, the lower court determined that nothing in Dr. Horowitz's findings would alter the ultimate conclusion that, but for the actions of Petitioner, the victim would not have died. In this regard, the court noted that "[i]n order for the defendant to be insulated from criminal responsibility, the death must be so 'unexpected, unforeseeable or remote' that the defendant's actions could not legally be the cause of death." The lower court opined that, in the present case, the fact remains that, but for Petitioner's actions, the victim would not have been in a position to receive faulty medical care, which led to a need for emergency surgery. Furthermore, the victim would not have become paralyzed, which led to his being placed on Cumadin, becoming Cumadin toxic, and developing a neurogenic bladder. The lower court concluded that, "Mr. Day would not have died in October of 1999 if he had not been shot on April 21, 1997." Accordingly, the lower court concluded that counsel was not ineffective in failing to present

36

testimony in accordance with that of Dr. Horowitz.

## b. Analysis

Petitioner's challenge to counsel's performance is three-fold. First, Petitioner maintains that counsel failed to present the testimony of a medical expert. Second, he asserts that counsel failed to object to cumulative testimony and/or failed to properly examine the State's two medical experts. Third, Petitioner asserts that counsel improperly relied on his co-counsel with respect to the medical issues at the heart of the case.

Petitioner's last argument is without merit and is discussed more thoroughly in subsection 4 of this section. Accordingly, we determine that addressing this issue again in this context is unnecessary. Thus, our review focuses on whether counsel was ineffective for failing to retain an independent medical expert and whether counsel competently challenged the State's medical evidence during Petitioner's trial.

Petitioner asserts that counsel failed to retain a neurologist to rebut the testimony of the State's medical experts. At the post-conviction evidentiary hearing, Mr. Scholl stated that the defense team had consulted with Dr. Haney, a pathologist, and Dr. Alabaster, a urologist. He stated that these doctors agreed with the opinions offered by the State's experts. Although these experts were consulted, Petitioner maintains that the failure to consult with a neurologist specifically constituted deficient performance. In support of his claim, Petitioner relies, in part, on Dr. Haney's recommendation to counsel that he consult with a neurologist. Petitioner maintains that had counsel consulted with a neurologist, he would have been able to present a proper defense on causation.

We start with a review of the medical proof at Petitioner's trial, the "new" evidence presented at the post-conviction hearing, and the standard of proof necessary to prove causation. The following synopsis is excerpted from our supreme court's decision:

> Both Drs. Smith and Gardner concluded that the victim died from sepsis due to a rupture of the bladder resulting from a gunshot wound to the head. The alleged discrepancy in their testimony arises in their disparate opinions as to how the bacteria that resulted in sepsis was introduced to the victim's body.

37

Dr. O.C. Smith testified that he had no opinion as to where the bacteria came from and that there were several potential sources for the bacteria. Dr. Smith surmised that the bacteria leading to the infection could have existed prior to the rupture of the bladder, could have been a result of the catheterization, or could have been the result of an infection of the urinary tract near the skin opening. However, Dr. Smith concluded that the "neurogenic bladder and . . . the fact that he has problems with bladder control . . . combined with the requirement for catheterization . . . predispose[d] [the victim] . . . to have a high risk of colonization and an increased risk of infection." Dr. Cynthia Gardner, Dr. Smith's assistant, testified that "[i]t probably was – I would say with ninety-nine percent certainty, the bacteria was introduced into the bladder through catheterization." Defendant Thomas contends that this "discrepancy" raises sufficient doubt as to the cause of death of the victim. We disagree.

Both doctors testified as to the injuries sustained by the victim when he was shot and the impact of the injuries upon the victim during the intervening period until his death. Any alleged "conflict" as to the source of the bacteria is insignificant. From the testimony of both medical examiners, it appears to this Court that the infection would not have occurred but for the victim's medical condition directly caused by the shooting of the victim on April 21, 1997. That is, the uncontradicted medical testimony established that the victim eventually died as a result of the gunshot wound inflicted during the robbery. Accordingly, the evidence of causation is sufficient to support the verdict of guilt and this issue is without merit.

*Thomas*, 158 S.W.3d at 389.

Next, we review the testimony presented at the post-conviction evidentiary hearing. Dr. Horowitz testified extensively as to the cause of Mr. Day's paralysis. To succinctly summarize his testimony, Dr. Horowitz opined that the paralysis was caused by medically-induced hypotension as a result of a breach in the standard of medical care by the attending staff at The Med. Dr. Horowitz concluded that there was no connection between the bullet wound and Mr. Day's subsequent neurological deficits and ultimate death. He added that the cause of Mr. Day's death was "[a]n overwhelming infection, uncontrollable diabetes with the state of diabetic ketoacidosis and an inability to clot because of the Cumadin toxicity." Dr. Horowitz admitted, however, that had Mr. Day not been shot on April 21, 1997, there would have been no reason for him to die on October 2, 1999.

38

The State had the burden of proof of establishing causation beyond a reasonable doubt. The evidence must establish that the defendant's actions or conduct caused the requisite harm. In a homicide prosecution, this is established by establishing that the victim's death was the natural and probable result of the defendant's unlawful act. *See State v. Barnes*, 703 S.W.2d 611, 614-15 (Tenn. 1985); *State v. Randolph*, 676 S.W.2d 943, 948 (Tenn. 1984); *Letner v. State*, 299 S.W. 1049, 1051 (Tenn. 1927); *Copeland v. State*, 285 S.W. 565, 566 (Tenn. 1926); *Odeneal v. State*, 157 S.W. 419, 421 (Tenn. 1913). That is, "[o]ne who unlawfully inflicts a dangerous wound upon another is held for the consequences flowing from such injury." *Odeneal*, 157 S.W. at 421. The person is responsible whether the result is "direct or through the operation of intermediate agencies dependent upon and arising out of the original cause." *Id.*

The question arises when an intervening act interrupts the causal chain. Indeed, intervening acts with which the defendant was in no way connected and, but for which the death would not have occurred, provide a good defense to the charge of homicide. *See Letner*, 299 S.W. at 1050-52. The intervening act may relieve the defendant of responsibility except when the intervening act is the natural result of the defendant's act. *Id.* The unlawful act need not be the sole cause of death. If the injury caused by the defendant contributed to the death, the defendant is responsible. The injury inflicted by the defendant need not be the immediate cause of death. A defendant is responsible if the direct cause of death naturally emanates from his conduct. *Id.* That is, a defendant cannot escape the consequences of his wrongful act by relying upon a supervening cause when such cause naturally resulted from his wrongful act. *Id.* In order for the defendant to be insulated from criminal responsibility, the death must be "so unexpected, unforeseeable or remote" that the defendant's actions could not legally be the cause of the death. *See Randolph,* 676 S.W.2d at 948.

At the post-conviction hearing, Dr. Horowitz attributed the victim's paralysis not to the gunshot wound but to hypotension resulting from wrongful medical treatment. He opined that this paralysis eventually led to the victim's neurogenic bladder and eventual death. Petitioner asserts that had trial counsel consulted a neurologist, Petitioner could have presented testimony which would have broken the causal chain. The question then becomes whether the improper medical treatment at The Med was a sufficient intervening act as to break the causal chain.

An intervening cause must not be reasonably foreseeable. Simple negligent medical treatment, although hopefully unusual, is sufficiently ordinary that we consider it foreseeable. *See People v. Saavedra-Rodriguez*, 971 P.2d 223, 226 (Colo. 1999).

39

In the absence of a statute expressly dealing with the effect of the medical treatment of an alleged homicide victim's wound, an accused who has inflicted upon the victim an injury calculated to destroy or endanger life cannot exonerate himself or herself and thereby avoid the natural consequences flowing from the injury by showing that the victim's life might have been saved by more skillful medical treatment.

40 Am. Jur. 2d *Homicide* § 18 (2008); *see United States v. Guillette,* 547 F.2d 743, 749 (2d Cir. 1976) (holding that when intervening events such as negligent medical treatment "are foreseeable and naturally result from a perpetrator's criminal conduct, the law considers the chain of legal causation unbroken and holds the perpetrator criminally responsible for the resulting harm."). "The negligent treatment or neglect of an injury will not excuse a wrongdoer unless the treatment or neglect was the sole cause of death. 40 Am. Jur. 2d *Homicide* § 18; *see Garcia v. Mathes*, 474 F.3d 1014, 1017-18 (8th Cir. 2007). However, thoroughly and extraordinarily incompetent care may break the chain of causation and absolve the defendant of criminal liability. If a third party's "independent act" "intervenes between the act of a criminal defendant and the harm to a victim, that act may only serve to cut off the defendant's criminal liability where the intervening act is the *sole cause* of harm." *People v. Bailey,* 549 N.W.2d 325, 334 (Mich. 1996) (emphasis added). In the medical treatment setting, evidence of grossly negligent treatment constitutes evidence of a sole, intervening cause of death where the initial wound would not have been fatal without treatment. *Saavedra-Rodriguez*, 971 P.2d at 227. Anything less than that constitutes, at most, merely a contributory cause of death, in addition to the defendant's conduct. *Id.*

In the present case, this Court need not determine whether the alleged breach of care was simple negligent treatment or grossly negligent treatment. It is without dispute that, without medical treatment on April 21, 1997, Mr. Day would have died from the injuries sustained as a result of the gunshot wound. Thus, it was reasonably foreseeable that Mr. Day would have died from the gunshot wound inflicted by Petitioner. Petitioner cannot establish any prejudice resulting from the alleged failure of counsel to consult a neurologist or otherwise more effectively challenge the State's expert witnesses.

Moreover, although we need not address the deficient performance prong of *Strickland*, we conclude that counsel was not deficient for failing to consult a neurologist and/or for failing to conduct a more effective cross-examination of the State's expert witnesses. The proof at the post-conviction hearing established that Mr. Scholl and Mr. Glatstein were aware of the import of the issue of causation, although causation relative to Petitioner was a secondary defense. Counsel did acknowledge that causation was Co-defendant Bond's

primary defense. In this regard and in lieu of their collegial working relationship, counsel for Petitioner worked closely with counsel for Co-defendant Bond on the medical causation issue. The proof at the post-conviction hearing established that counsel for both Petitioner and Co-defendant Bond consulted other medical experts who reached the same or substantially similar conclusion as the State's experts. Counsel made a reasoned decision, with consideration of results, funding, and time, to stop investigating additional experts. Similarly, we do not find counsel's cross-examination of the State's experts deficient nor do we find counsel's failure to object to their testimony on the basis that the testimony was cumulative to be deficient. Mr. Scholl's cross-examination of the State's expert witnesses was thorough and focused upon the differences in their opinions. Petitioner is not entitled to relief on this issue.

### 3. Trial counsel failed to object to the prosecution's use of "greed and evil."

As related in our supreme court's opinion on direct appeal, during Petitioner's trial:

> The prosecutor for the State who made opening statement in this case began, "You can't hide from greed and evil. James Day learned that lesson on April 21st, 1997. . . ." She continued: "James Day learned you can't hide from greed and evil," and "He walked into the path of greed and evil." Throughout opening statement, the prosecutor referred collectively to Defendant Thomas and Defendant Bond as "greed and evil." This theme was repeated during closing argument, in which both prosecutors made references that "James Day couldn't hide from greed and evil," "there was no hiding from or escaping the circle of greed and evil," and "greed and evil really didn't care that day whether he lived or died." The prosecutors referred to the Defendants as "greed and evil" a total of twenty-one times during the opening statement and closing arguments of the guilt phase of the trial.

*Thomas*, 158 S.W.3d at 413. No objection was made at trial. Mr. Scholl conceded that he failed to object to the prosecution's use of the epithet. He noted, however, that the issue was raised on direct appeal.

In considering the issue on direct appeal, our supreme court held that "[t]he prosecutors' repeated references to Defendant Thomas and Defendant Bond as 'greed and evil' was improper." *Id.* at 414. The court noted that "[n]o curative instruction was provided primarily because neither Defendant Thomas nor Defendant Bond objected to the characterization."

41

*Id.* "Moreover, the State's case was strong and the effect of the error was insignificant." The supreme court determined that "the prosecutors' comments [were] unseemly but harmless in the context of the entire argument." *Id.* In short, the court held that "the State's improper argument did not undermine the fundamental fairness of the trial."

The post-conviction court, relying upon our supreme court's holdings, found that counsel was deficient for failing to object to the State's use of "greed and evil." However, the lower court declined to find that this deficient performance resulted in prejudice to Petitioner, relying upon the supreme court's conclusion that the error was "insignificant" and "did not undermine the fundamental fairness of the trial." We agree. The fact that this issue is now couched in terms of ineffective assistance of counsel terms does not alter the finding of our supreme court that the error was "insignificant.". Our supreme court has found the use of the terms "greed and evil" in Petitioner's trial to be harmless error. Accordingly, Petitioner has failed to carry his burden in establishing that he suffered prejudice as a result of counsel's failure to object to the use of the terms. Petitioner is not entitled to relief on this claim.

### 4. Co-Counsel Rendered Ineffective Assistance of Counsel

Petitioner complains that co-counsel, Mr. Glatstein, failed to function as constitutionally effective counsel. In support of his claim, Petitioner relies upon testimony that, at the time of Petitioner's trial, Counselor Glatstein was attending school in a Masters program and was in the process of winding down his law practice. He cites Mr. Glatstein's admission that he was "not too active in this case." Lead counsel, Mr. Scholl testified that Mr. Glatstein was in charge of the medical record. Petitioner implies that since Mr. Glatstein was in the process of winding down his law practice, Petitioner was deprived of the effective assistance of counsel as the medical issue was a critical issue in Petitioner's case.

Mr. Scholl testified that their primary defense was that Petitioner was not involved in the Walgreens robbery. Because Co-defendant Bond had provided a confession, Co-defendant Bond's primary defense was the medical causation issue. Mr. Scholl testified that he and Co-defendant Bond's lead counsel, Howard Manis, had a very close working relationship. Mr. Scholl testified that he, Mr. Manis, and Mr. Glatstein all worked together on the issue of causation. Mr. Scholl stated that he was ultimately responsible for Petitioner's causation defense.

Although Petitioner implies that co-counsel Glatstein's performance was deficient in relation to the medical records, Petitioner fails to assert "how" counsel's performance was

42

deficient. Rather, Petitioner relies upon and assumes deficient performance from Mr. Glatstein's admission that he was winding down his law practice at the time of the trial. Ineffectiveness under *Strickland* requires more than just an assumption of deficient performance due to the personal circumstances of counsel. Rather, Petitioner must demonstrate with specificity that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. Moreover, even if a defendant meets this threshold, he or she must also prove that such error prejudiced the defense. *Id.* Petitioner has failed to meet this threshold. Petitioner is not entitled to relief on this claim.

## 5. Trial counsel failed to introduce evidence that Mr. Jackson committed the crime.

The proof at the post-conviction evidentiary hearing revealed that, three months after the Walgreens robbery, Mr. Jackson attempted to rob a Loomis Fargo guard at the Southbrook Mall in Memphis. Petitioner's trial counsel, Mr. Scholl, stated that part of the defense strategys was that Co-defendant Bond was involved in the Walgreens robbery with another person, not Petitioner. He stated that the other person was Mr. Jackson. Mr. Scholl conceded that he was aware that Mr. Jackson had been involved in a similar robbery at Southbrook Mall. Petitioner contends that Mr. Scholl's performance was deficient and prejudicial in that he did not seek admission of evidence of Mr. Jackson's similar crime at the Southbrook Mall. Petitioner further complains that he was prejudiced by Mr. Scholl's failure to introduce testimony that Ms. Jackson dated Mr. Jackson.

### a. Post-Conviction Court's Findings

The lower court entered the following findings of fact and conclusions of law as to this claim. Mr. Jackson testified that he had no knowledge of the Walgreens robbery and stated that he did not know Ms. Jackson. Ms. Jackson testified that she did not know Mr. Jackson. The lower court found that, even had counsel called Mr. Jackson to testify at trial, there was no basis for questioning him regarding the robbery at the Southbrook Mall. Moreover, the court reasoned, that absent any additional proof tying Mr. Jackson to the Walgreens robbery, it was unlikely that the trial court would have permitted counsel to assert that the descriptions of the perpetrators provided by certain witnesses were more closely related to the physical features of Mr. Jackson than those of Petitioner. The lower court related that trial counsel testified that the case turned on whether the jury believed Ms. Jackson. Trial counsel attempted to make Ms. Jackson appear less credible. Moreover, counsel attempted to implicate Mr. Jackson, although there was only so far he could ethically pursue the Mr.

43

Jackson defense. The lower court determined that trial counsel was not ineffective for failing to present proof to the jury. In so concluding, the lower court reasoned that there was a limited basis for attacking Mr. Jackson and, even had further investigation been conducted, there would have been little evidence linking Mr. Jackson and Ms. Jackson. Finally, the lower court questioned the admissibility of such proof.

### b. Analysis

Petitioner's claim against counsel is three-fold. First, he asserts that counsel was ineffective for failing to introduce the circumstances of the Southbrook Mall robbery involving Mr. Jackson. Next, he asserts that counsel was ineffective for failing to introduce evidence that Ms. Jackson and Mr. Jackson had a romantic relationship. Finally, Petitioner contends that counsel was ineffective for failing to introduce the testimony of eyewitnesses whose description of the perpetrator more closely matched that of Mr. Jackson than that of Petitioner.

Petitioner argues that evidence of Mr. Jackson's involvement in the Southbrook Mall robbery and evidence of Mr. Jackson's romantic involvement with Ms. Jackson would have provided the information to the jury to establish that it was Mr. Jackson who committed the Walgreens robbery. At Petitioner's trial, counsel did attempt to elicit testimony that Mr. Jackson and Ms. Jackson were involved in a romantic relationship. Mr. Scholl specifically questioned witness William Upchurch as to his knowledge of their relationship. At trial, the following colloquy occurred:

Q:     And who do you know No. 3 is?

A:      Bobby Knight

Q:     Is that his real name?

A:     That's his nickname.

Q:     Why do they call him Bobby Knight?

A:     He's got a knot – knot on his forehead.

Q:     What is his real name.

A:     Mr. Jackson.

Q:     And how did you know Mr. Jackson?

A:     Growed up and went to school with him.

Q: And do you know if Mr. Jackson knew Ms. Jackson?

A: Yes.

Q: In what way?

A: They was dating.

Mr. Scholl also questioned Stephanie Williams about the relationship. Ms. Williams testified that she and Mr. Jackson grew up together and went to school together. She stated that Mr. Jackson and Ms. Jackson used to date.

At the post-conviction evidentiary hearing, Petitioner introduced the testimony of Barry Brown, Tonya Gentry, and Ms. Williams, all of whom testified that Ms. Jackson and Mr. Jackson were dating. Mr. Brown was a life-long friend of Petitioner. He testified that Ms. Jackson dated Mr. Jackson at or near the same time that she dated Petitioner. Ms. Gentry, another long-time friend of Petitioner, testified that Ms. Jackson dated Mr. Jackson during her marriage to Petitioner. Ms. Williams, Petitioner's cousin, testified that Ms. Jackson dated Mr. Jackson in 1997. She explained that this may have occurred prior to Ms. Jackson's marriage to Petitioner. She stated that Ms. Jackson and Mr. Jackson dated again after Petitioner was incarcerated.

Mr. Jackson testified that he never dated Ms. Jackson. He further stated that he knew neither Ms. Jackson nor Petitioner. Ms. Jackson testified that she never was involved in a romantic relationship with Mr. Jackson. She stated that she did not know him personally, but she may have seen him in her apartment complex. Ms. Jackson denied any suggestion that she and Mr. Jackson had conceived the story implicating Petitioner's involvement in the Walgreens robbery.

Ms. Jackson had testified on numerous occasions relating to Petitioner's involvement in the Walgreens robbery. Ms. Jackson's testimony, over the years, has been consistent. The witnesses at the post-conviction hearing who testified to a romantic relationship between Mr. Jackson and Ms. Jackson all had a direct personal relationship with Petitioner. Moreover, the testimony of these witnesses as to the timing of the alleged romantic relationship was vague and was somewhat inconsistent. For example, Tonya Gentry testified that Ms. Jackson dated Mr. Jackson *after* her marriage to Petitioner. Ms. Jackson and Petitioner did not marry until *after* the Walgreens robbery.

45

We acknowledge that trial counsel *did* present testimony that Mr. Jackson and Ms. Jackson were involved in a romantic relationship. However, the post-conviction court obviously accredited the testimony of Ms. Jackson and Mr. Jackson refuting any indicia that the two were involved romantically. Questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are resolved by the post-conviction judge, not the appellate courts. *Momon*, 18 S.W.3d at 156; *Henley*, 960 S.W.2d at 579. Unlike appellate courts, trial courts are able to observe witnesses as they testify and to assess their demeanor, which best situates trial judges to evaluate witness credibility. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).

Petitioner also complains that trial counsel failed to call witnesses who would have given a description which was more similar to the physical description of Mr. Jackson than Petitioner. At the post-conviction hearing, Mr. Scholl testified that he was afraid to bring witnesses into the courtroom who might, upon seeing his client for the first time, identify him as one of the perpetrators. Mr. Scholl explained that their primary defense at trial was that Petitioner was not involved in the robbery. Mr. Scholl did not want to jeopardize that defense with witnesses who could potentially identify his client. The post-conviction court found that:

> As to the identification by other witnesses, this court can not find counsel was ineffective in failing to call Ms. McDonald, Mr. Roth or others, given that counsel had reason to believe these individuals could possibly identify his client.

The lower court noted that Mr. Scholl testified that he asked Petitioner whether he should have had the surveillance video enhanced, explaining to Petitioner that to do so would likely reveal the identity of the shooter. The lower court continued:

> Scholl testified that Petitioner informed him that he should not have the video enhanced. Correctly or incorrectly, Scholl implied that he took Petitioner's statements to mean that he may be implicated in the robbery. Thus, Scholl proceeded to prepare his defense with that caveat in mind. Under the circumstances, this court can not fault counsel for this assumption and does not find that tactical decisions made based upon this assumption amounted to ineffective representation.

Mr. Scholl also testified at the post-conviction evidentiary hearing that, during

46

Petitioner's federal trial, one of the defense witnesses, who had not made an identification previously, walked into the courtroom and identified Petitioner as the shooter. Mr. Scholl rationalized that the fewer people who were called to make an identification the better. He stated that the prosecution's witnesses provided somewhat inconsistent identifications, and these inconsistencies would be his focus. Mr. Scholl testified:

> So the more people that I put – that get in there and that say we've got this thin guy that pulled a gun out there and shot him or the more people that come in and say, oh, no, now I do see him. I recognize who he is. That's the shooter. The worse off we're going to be. So you know I made decisions not to call those people, and I stand by that decision. I think it was the right one.

Mr. Scholl further explained:

> I've got enough out there that I can put Mr. Jackson out there as a suspect, but I've got a good idea that Mr. Jackson's not – potentially not the one that shot him, may have, may not have. I have enough to indicate that he's a suspect, but if I carry certain things too far and rule him completely out as a suspect, I would lose that whole defense altogether.

The federal courts have said the following about trial counsel's decision to call witnesses:

> A trial counsel's "decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." Because of this inherently tactical nature, the decision not to call a particular witness generally should not be disturbed." *See United States v. DeJesus*, 57 Fed. Appx. 474, 478 (2d Cir. 2003) (quoting *United States v. Smith*, 198 F.3d 377, 386 (2d Cir. 1999)) (citation omitted).

Finally, Petitioner complains that counsel failed to enter into evidence the circumstances of Mr. Jackson's attempted robbery of the Loomis Fargo guard at the Southbrook Mall. At the conclusion of the post-conviction hearing, the lower court determined that the admissibility of such proof was questionable, finding that "there was no basis for questioning him regarding the robbery he was involved in at the Southbrook Mall." On appeal, Petitioner asserts that evidence that someone other than the accused committed the crime is relevant.

47

In this regard, he asserts that evidence of a third party's bad acts are admissible to support the defendant's theory that a third party committed the crime in question.

Criminal defendants have a constitutional right, implicit in the Sixth Amendment, to present a defense, and this right is "a fundamental element of due process of law." *State v. Brown*, 29 S.W.3d 427, 432 (Tenn. 2000) (quoting *Washington v. Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 1923 (1967)). In this regard, an accused is entitled to present evidence implicating others in the crime of which he is charged. *See State v. Powers*, 101 S.W.3d 383, 394 (Tenn. 2003) (citing *Sawyers v. State*, 83 Tenn. (15 Lea) 694, 695 (1885)). At the time of Petitioner's trial, the intermediate appellate courts of this state applied a "direct connection" test. *See Powers*, 101 S.W.3d at 395, n.7 (citing *State v. Harvey D'Hati Moore*, No. 03C01-9704-CR-00131, 1998 WL 156908 (Tenn. Crim. App., at Knoxville, Mar. 18, 1998); *State v. Mark Peck*, No. 958, 1991 WL 154534 (Tenn. Crim. App., at Knoxville, Aug. 15, 1991), *perm. app. denied*, (Tenn. Jan. 27, 1992)). Under the direct connection test, "the evidence must directly connect the third party with the substance of the crime and must clearly point out someone besides the accused as the guilty person in order to be admissible." *Id*; *Powers*, 101 S.W.3d at 395. In 2003, our supreme court rejected the "direct connection test," holding that "such a standard imposes too high a threshold for the admissibility of evidence concerning third-party culpability." *Id*. Our supreme court determined that "the Rules of Evidence are adequate to determine whether such evidence is admissible." Thus, under the current law, a third party's previous "crimes, wrongs, or bad acts" may be admissible if relevant. *State v. Stevens*, 78 S.W.3d 817, 837 (Tenn. 2002).

Despite the subsequent ruling by the supreme court, at the time of Petitioner's trial, the law guiding the admissibility of the acts of a third party was the "direct connection test." The "direct connection test" has been set out as follows:

> The evidence to establish that someone other than the defendant is the guilty party must be such evidence as would be relevant on the trial of the third party; and the evidence offered by the accused as to the commission of the crime by a third party must be limited to such facts as are inconsistent with the defendant's guilt, and to such facts as raise a reasonable inference or presumption as to the defendant's innocence. *Hensley v. State,* 28 Tenn. 243 (1848). To be admissible, the evidence must be such proof as directly connects the third party with the substance of the crime, and tends to clearly point out that someone besides the accused as the guilty person. Evidence which can have no other effect than to cast a bare suspicion on another, or to raise a conjectural inference as to the commission of the crime by another, is

not admissible.  22A C.J.S. Criminal Law § 729 (1989).

*State v. Mark Peck*, No. 958, 1991 WL 154534, *7 (Tenn. Crim. App., at Knoxville, Aug. 15, 1991), *perm. app. denied*, (Tenn. Jan. 27, 1992).

The post-conviction court applied the law at the time of the trial and determined that no evidence directly implicated Mr. Jackson in the Walgreens robbery.  We agree with the State's assertion that the fact that Mr. Jackson attempted an armored car robbery at the Southbrook Mall raises nothing more than "a conjectural inference" that he might be suspected of the earlier Walgreens crime.  Clearly, applying the law at the time of the offense, the evidence of Mr. Jackson's involvement in the Southbrook Mall robbery would not have been admissible at trial.  He has failed to establish that counsel was deficient in his performance.  Petitioner is not entitled to relief on this claim.

### 6.  Trial counsel's cumulative errors amounted to ineffective representation.

Petitioner asserts that his attorneys' performance was constitutionally deficient based upon the cumulative effect of the errors. We conclude Petitioner's attorneys did not afford him ineffective assistance of counsel based on any single alleged error or the cumulative effect thereof. Petitioner is not entitled to relief on this issue.

### C.  Appellate Deficiencies

Petitioner asserts that counsel, Robert Brooks, was ineffective on appeal. Petitioner's argument in this regard is solely that counselor Brooks failed to raise any of the many Confrontation Clause issues arising from the introduction of Co-defendant Bond's redacted statement in Petitioner's direct appeal.

The same principles apply in determining the effectiveness of both trial and appellate counsel. *Campbell v. State,* 904 S.W.2d 594, 596 (Tenn. 1995).  A petitioner alleging ineffective assistance of appellate counsel must prove that: (1) appellate counsel acted objectively unreasonably in failing to raise a particular issue on appeal; and (2) absent counsel's deficient performance, there was a reasonable probability that defendant's appeal would have been successful before the state's highest court. *E.g., Smith v. Robbins*, 528 U.S. 259, 285, 120 S. Ct. 746, 764 (2000); *Aparicio v. Artuz*, 269 F.3d 78, 95 (2d Cir. 2001);

*Mayo v. Henderson*, 13 F.3d 528, 533-34 (2d Cir. 1994). To show that counsel was deficient for failing to raise an issue on direct appeal, the reviewing court must determine the merits of the issue. *Carpenter v. State*, 126 S.W.3d 879, 887 (Tenn. 2004) (citing *Kimmelman,* 477 U.S. at 375, 106 S. Ct. at 2583). "Obviously, if an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it." *Id*. When an omitted issue is without merit, Petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal and cannot prevail on an ineffective assistance of counsel claim. *Id*. at 887-88. Additionally, ineffectiveness is very rarely found in cases where a defendant asserts that appellate counsel failed to raise an issue on direct appeal. One reason for this is that the decision of what issues to raise is one of the most important strategic decisions to be made by appellate counsel.

In *Gray v. Greer,* 800 F.2d 644 (7th Cir. 1986), The Seventh Circuit Court of Appeals established the following test for determining whether counsel was deficient in *Strickland* terms for failing to raise particular claims on direct appeal:

> [S]ignificant issues which could have been raised should then be compared to those which were raised. Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective counsel be overcome.

*Gray,* 800 F.2d at 646.

In *Carpenter v. State*, 126 S.W.3d 879 (Tenn. 2004), our supreme court refused to hold that the *Gray* standard was the conclusive test of finding deficient performance. *Carpenter*, 126 S.W.3d at 888. Our supreme court noted that the relative strength of the omitted issue is only one among many factors to be considered. Indeed, the court noted the numerous factors relied upon by the Sixth Circuit Court of Appeals in evaluating appellate counsel's failure to raise issues. *Id*. The non-exhaustive list includes:

> 1) Were the omitted issues significant and obvious?
> 2) Was there arguably contrary authority on the omitted issues?
> 3) Were the omitted issues clearly stronger than those presented?
> 4) Were the omitted issues objected to at trial?
> 5) Were the trial court's rulings subject to deference on appeal?
> 6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?

7) What was appellate counsel's level of experience and expertise?

8) Did Petitioner and appellate counsel meet and go over possible issues?

9) Is there evidence that counsel reviewed all the facts?

10) Were the omitted issues dealt with in other assignments of error?

11) Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Id.* Our supreme court acknowledged that the Sixth Circuit's final factor reaches the ultimate issue under the first prong of *Strickland* and is, therefore, not helpful in deciding whether appellate counsel's performance was deficient.

At the post-conviction hearing, Counselor Brooks could not offer explanation as to why Confrontation Clause issues were not raised on direct appeal. He stated that "if there was a legitimate issue, it would definitely be error not to raise it." The lower court concluded that Counselor Brooks should have raised issues regarding the redacted confession on appeal. We are constrained to agree with the lower court in this respect. As found by the post-conviction court, we have determined that any *Bruton* error was harmless. We can hardly fault appellate counsel for failing to allege an error that was harmless. *See generally, United States v. Arena*, 180 F.3d 380, 396 (2d Cir. 1999) (stating that a "Failure to make a meritless argument does not amount to ineffective assistance"), *cert. denied*, 531 U.S. 811, 121 S. Ct. 33 (2000); *United States v. Kirsch*, 54 F.3d 1062, 1071 (2d Cir.) (stating that "[T]he failure to make a meritless argument does not rise to the level of ineffective assistance"), *cert. denied*, 516 U.S. 927, 116 S. Ct. 330 (1995); *United States v. DiPaolo,* 804 F.2d 225, 234 (2d Cir.1986) (finding no ineffective assistance where attorney failed to make an objection that "appears without merit"). Accordingly, we decline to conclude that appellate counsel was deficient for not raising as plain error issues related to Co-defendant Bond's redacted statement. Petitioner is not entitled to relief on this ground.

## II. Newly Discovered Evidence

Petitioner asserts that he is entitled to coram nobis relief and a new trial because of newly discovered evidence. He maintains that, "shortly after [he] was convicted, his alleged accomplice and his co-defendant [Bond] recanted the confession he gave to the extent it implicated Thomas." Petitioner asserts that Co-defendant Bond's confession was a "key piece of the evidence relied on by the State in its summation that led to [his] conviction."

The newly discovered evidence is a handwritten letter written by Co-defendant Bond and sent to Petitioner on or about January 20, 2002, while both of their convictions were on direct appeal. In the letter, Co-defendant Bond allegedly admits that he and Angie Jackson falsely implicated Petitioner in the Walgreen's robbery:

[M]e and your bitch Angie played you playa.  It's a cold game and a cold world and we in both of them so its freezing . . .  I kept it real with you on the Ms B Robbery I didn't implicate you which I could have.  But you took 8 years for the shit so thats on you. . . . I'm gone [sic] let you see how cold this game is.  When you was fucking all them hoes on Angie she was fucking off to and then she lied on you about the Walgreens case.  The Hoe was fucking the Mr. Jackson the whole time you was living with her. . . . Angie knew that me and Bobby hit the Fargo truck but the bitch lied about me cumin [sic] back to her house.  When I saw you, Chevy and Corey in South Memphis I had already got paid and was heading to the car lot.  I heard that yall had hit the Big Mike Boy for 15,000 and 20 pounds of weed . . . . White Boy Scott Sanders from the feds who had the Walgreens case was gone [sic] fuck me off because of my finger prints on the Bonneville.  He tole [sic] me all he wanted was a shooter so I gave them you.  The reason why I didn't tell on Bobby was because he didn't try to fuck my hoe like you did.  Since you tried to cross me I crossed you.  It was either you or me, so it had to be you.  Angie didn't snitch on Bobby even though she new [sic] the business.  The feds paid the hoe to lie on you.  I didn't think the hoe would fuck you off like that.  The Fisher brothers had identifide [sic] Bobby at the Walgreens.  Angie is a dog bitch.  I know you want to kill the hoe for lying on you about this case cause I would if I was in your shoes.  That Bobby . . . tried to hit another truck at the southland mall but they got shot and then they got caught. . . . I hate that shit went down like that but its every man for himself.  I wish you luck on your appeal.  I got 47 issues on my shit so I know that I should strike Gold.  For what its worth I still fuck wit cha.

Petitioner asserts that this statement is consistent with statements from eyewitnesses who either selected Mr. Jackson from a photo array or provided physical descriptions of the driver of the getaway car that match Mr. Jackson's description.  He contends that he would not have been convicted without Co-defendant Bond's confession and Ms. Jackson's false testimony.  Accordingly, he asserts that he is entitled to a new trial.

## A.  Applicable Law

The writ of error coram nobis, available only to convicted defendants in criminal cases, is an "extraordinary procedural remedy," filling "only a slight gap into which few cases fall." *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999).  The purpose of this remedy is to bring to the attention of the court some fact unknown to the court which if known may

have resulted in a different judgment. *See State v. Vasques*, 221 S.W.3d 514, 524 (Tenn. 2007). Tennessee Code Annotated section 40-26-105(b) provides:

> The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

The petition for writ of error coram nobis relief must contain: "(1) the grounds and the nature of the newly discovered evidence; (2) why the admissibility of the newly discovered evidence may have resulted in a different judgment had the evidence been admitted at the previous trial; (3) Petitioner was without fault in failing to present the newly discovered evidence at the appropriate time; and (4) the relief sought by Petitioner." *Freshwater v. State*, 160 S.W.3d 548, 553 (Tenn. Crim. App. 2004).

Coram nobis petitions are subject to a one year statute of limitations. *See* T.C.A. § 27-7-103. The one year statute of limitations may be tolled only when necessary not to offend due process requirements. *See Workman v. State*, 41 S.W.3d 100, 103 (Tenn. 2001). Determining whether a claim is barred by an applicable statute of limitations is a question of law. Our review of such claims is de novo. *Harris v. State*, 301 S.W.3d 141, 144 (Tenn. 2010) (citing *Brown v. Erachem Comilog, Inc.*, 231 S.W.3d 918, 921 (Tenn. 2007)). Our supreme court has "constru[ed] the coram nobis statute of limitations consistent with the longstanding rule that persons seeking relief under the writ must exercise due diligence in presenting the claim." *Id*. (citing *Mixon*, 983 S.W.2d at 670). "The State bears the burden of raising the bar of the statute of limitations as an affirmative defense." *Id*. (citing *Harris v. State*, 102 S.W.3d 587, 593 (Tenn. 2003)).

The question whether to grant or deny a petition for writ of error coram nobis on its merits is a question left in the sound discretion of the trial court. *Id*. (citing *Vasques*, 221 S.W.3d at 527-28). Therefore, review by the appellate courts is limited to ascertaining whether the trial court abused its discretion. *Freshwater*, 160 S.W.3d at 553; *State v. Workman*, 111 S.W.3d 10, 18 (Tenn. Crim. App. 2002). A lower court abuses its discretion when it "applie[s] incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an

53

injustice to the complaining party." *Id*.; *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008).

## B. Post-Conviction Court's Findings

The post-conviction court made extensive findings of fact and conclusions of law regarding the allegation of newly discovered evidence. Specifically, the lower court questioned the veracity of Co-defendant Bond's recanted confession. In doing so, the lower court acknowledged that a United States Court Judge who reviewed the letter also found that the letter was "suspicious in its timing, comprehensive content, and the manner in which it is crafted. See United States v. Thomas, No. 032416 JPM-tpm, July 9, 2007, order of Judge Jon McCalla, United States District Court for Western District of Tennessee." Additionally, the lower court noted numerous contradictions in the letter. Finally, the post-conviction court concluded that there was nothing to support Petitioner's claim that the assertions in the letter were true.

The lower court found that Mr. Jackson denied involvement in the robbery and denied knowing Ms. Jackson. Ms. Jackson provided the same factual scenario to which she had testified at the federal trial and at two state court proceedings. The lower court acknowledged that Ms. Jackson repeatedly denied knowing Mr. Jackson. Accordingly, the lower court found:

> Bond's motives for writing the recantation letter are just as nefarious as they are pure. . . . [T]his court is not "reasonably well satisfied" that Bond's recantation is true. . . . [T]he court need not determine whether petitioner was diligent in discovering this evidence and/or whether this evidence, if presented to the jury may have resulted in a different result at trial. . . .

Based upon these findings, the lower court determined that Petitioner was not delinquent in failing to present this claim at a prior proceeding. Notwithstanding, the lower court found that there was not a reasonable probability that had the recanted confession been introduced at trial that it "may have" led to a different result. Rather, the lower court determined that had Co-defendant Bond's recantation letter been introduced at the trial the jury would have merely been presented with two conflicting statements presented by a non-testifying co-defendant. The lower court then determined that "it is not likely the jury would have reached a different result."

54

## C. Analysis

### 1. Timeliness

In the present case, the lower court acknowledged that the State did not object on the basis of timeliness to Petitioner's coram nobis claim at the post-conviction hearing. The lower court determined that it "need not address the issue of whether petitioner's claims have been timely raised." Notwithstanding, the lower court determined that:

> Like *Workman* and *Ratliff*, petitioner's interest in obtaining a hearing to present newly discovered evidence, which may establish actual innocence, far outweighs any governmental interest in preventing the litigation of stale claims. Thus, due process precludes application of the statute of limitation in this case.

In determining whether tolling is required by due process concerns, "a court must weigh Petitioner's interest in obtaining a hearing to present a later-arising ground for relief against the State's interest in preventing stale and groundless claims." *Harris*, 301 S.W.3d at 145 (citing *Workman*, 41 S.W.3d at 103). Our supreme court has established a three-step analysis to balance these interests:

> (1) determine when the limitations period would normally have begun to run;
>
> (2) determine whether the grounds for relief actually arose after the limitations period would normally have commenced; and
>
> (3) if the grounds are "later-arising," determine if, under the facts of the case, a strict application of the limitations period would effectively deny Petitioner a reasonable opportunity to present the claim.

*Id.* (quoting *Sands v. State*, 903 S.W.2d 297, 301 (Tenn. 1995)).

In the present case, Petitioner's trial was conducted in 2001. The motion for new trial was denied on December 14, 2001. The limitations period would have begun to run thirty days after the trial court denied Petitioner's motion for new trial. The petition for coram nobis relief was filed on November 13, 2006. It is without question that Petitioner's motion was filed outside the statute of limitations period. Notwithstanding, due process may require that the statute of limitations for filing a petition for writ of error coram nobis be tolled. *See*

55

*Workman*, 41 S.W.3d at 103 (holding due process required tolling of the statute of limitations where "Workman's interest in obtaining a hearing [to present newly discovered evidence that may establish actual innocence of a capital offense] clearly outweighs any governmental interest embodied in the statute of limitations").

The newly discovered evidence, *i.e.*, Co-defendant Bond's letter to Petitioner, was sent on or about January 20, 2002. The letter was sent a little over a month after the motion for new trial was denied. No explanation is provided as to the delay in asserting this claim. Indeed, Petitioner was in possession of the letter for nearly five years before the claim was asserted. The State failed to raise the statute of limitations as a defense at trial or on appeal. Notwithstanding, the State's failure to assert the statute of limitations is not conclusive to our analysis. Finally, we must consider whether Petitioner was provided a reasonable opportunity to present his claim of newly discovered evidence. Again, Petitioner waited nearly five years before asserting his claim. Petitioner was in possession of the evidence during the pendency of his direct appeal and within one year of the dates that his conviction in the trial court became final.

In *Harris v. State*, 301 S.W.3d 141 (Tenn. 2010), our supreme court addressed "when delay in seeking coram nobis relief may be unreasonable as a matter of law . . . ." 301 S.W.3d at 146. The facts presented in *Harris* established that Petitioner was convicted on March 1, 1988. The motion for new trial was denied on May 4, 1988. His conviction and sentence were affirmed on direct appeal by this Court on November 8, 1990, and our supreme court denied permission to appeal on February 4, 1991. *State v. Ricky Jerome Harris,* No. 85, 1990 WL 171507 (Tenn. Crim. App., at Knoxville, Nov. 8, 1990), *perm. app. denied*, (Tenn. Feb. 4, 1991). In 1992, Petitioner sought post-conviction relief. The trial court's denial of post-conviction relief was affirmed by this Court on April 23, 1998, and the supreme court denied further review on December 7, 1998. *Ricky Harris v. State*, No. 03C01-9611-CR-00410, 1998 WL 191441 (Tenn. Crim. App., at Knoxville, Apr. 23, 1998), *perm. app. denied*, (Tenn. Dec. 7, 1998). On December 10, 1998, Petitioner filed a motion to reopen his petition for post-conviction relief, alleging that the State failed to disclose the identity of a purported alibi witness. *Harris*, 301 S.W.3d at 143. The lower court denied the motion to reopen. On direct appeal, a majority of this Court treated the motion to reopen as a petition for writ of error coram nobis and remanded the matter for a hearing on the merits. The supreme court granted the State's application for permission to appeal. *Id*. A majority of the court held that this Court erred in treating the motion to reopen as a petition for writ of error coram nobis. The supreme court held that the motion to reopen failed to state a cognizable claim for relief. *See Harris v. State*, 102 S.W.3d 587 (Tenn. 2003). On March 11, 2004, the petitioner filed a petition for writ of error coram nobis relief. *Harris*, 301 S.W.3d at 143.

The petitioner in *Harris* alleged that he did not become aware of the new evidence until 1998 and that he did not obtain evidence proving the exculpatory nature of the evidence until June 2002. *Id*. at 143-44. The supreme court determined that the petitioner "could have asserted a coram nobis claim as early as 1998 with regard to the alibi evidence and as early as June 2002 with regard to the third-party confession evidence." *Id*. at 146. The court further stated that the petitioner waited approximately six years with regard to the alibi evidence and aprpoximately twenty-one months with regard to the third-party confession evidence before filing a petition for writ of error coram nobis. *Id*. The court recognized that there is no Tennessee statute or common law tolling rule which would provide that the time for filing a cause of action is tolled during the period in which a litigant pursues a related but independent cause of action. *Id*. at 147. The court held that "the opportunity to assert a coram nobis claim was entirely within Mr. Harris' control after 1998 with regard to the alibi evidence and after June 2002 with regard to the third-party confession evidence." *Id*. The court noted that "[n]othing prevented Mr. Harris from filing a separate coram nobis action while his motion to reopen was pending." *Id*. In this regard, our supreme court held that "[t]he time within which Mr. Harris filed his petition for writ of error coram nobis exceeds the reasonable opportunity afforded by due process. Mr. Harris's delay in seeking coram nobis relief . . . is unreasonable under the circumstances of this case." *Id*. The court determined that the petition for writ of error coram nobis is barred by the statute of limitations.

In the present case, Petitioner's trial was conducted in 2001. The motion for new trial was denied on December 14, 2001. Co-defendant Bond's letter to Petitioner was sent on or about January 20, 2002. The petition for coram nobis relief was filed on November 13, 2006. As in *Harris*, nothing prevented Petitioner from seeking coram nobis relief while his direct appeal was pending. Petitioner was in possession of the letter in January 2002, nearly five years before he sought relief based upon this evidence. As in *Harris*, we conclude that the time within which Petitioner filed his petition for coram nobis relief exceeds the reasonable opportunity afforded by due process. The delay of nearly five years is unreasonable. Accordingly, the petition for writ of error coram nobis is barred by the statute of limitations. Having concluded that his petition is time-barred, we need not address the merits of his claim.

### III. Constitutional Challenges to Tennessee's Death Penalty Statutory Scheme

Petitioner asserts that "[t]he current system of administering the death penalty is so broken and fraught with errors and inequities that it runs afoul of the Eighth Amendment of the United States Constitution and Article I, §§ 8, 16 of the Tennessee Constitution." He

contends that the imposition of the death penalty in his case violates his constitutional guaranties of due process, equal protection and freedom from cruel and unusual punishment. In support of his argument, Petitioner relies upon a recent study by the American Bar Association, *i.e.*, ABA, Evaluating Fairness and Accuracy in State Death Penalty Systems: The Tennessee Death Penalty Assessment Report (March 2007). Specifically, he relies upon the ABA's conclusion that "[t]he state of Tennessee currently does not guarantee a fair and accurate system for all capital defendants." In this regard, Petitioner makes the following challenges to Tennessee's death penalty statutory scheme.

### A.  Inadequate Procedures to Address Innocence Claims

Petitioner first asserts that the State of Tennessee fails to properly ensure that claims of actual innocence receive adequate judicial review. He contends that neither post-conviction proceedings nor coram nobis proceedings are working as intended. In support of his assertion, Petitioner relies solely upon the ABA's assessment of Tennessee's Death Penalty. The ABA's report highlighted that one of the most important areas in need of reform in the Tennessee death penalty structure was:

> **Inadequate Procedures to Address Innocence Claims** . . . – The State of Tennessee does not properly ensure that claims of factual innocence receive adequate judicial review. While the State of Tennessee has mechanisms to handle claims of factual innocence, including normal post-conviction proceedings and writs of error coram nobis, neither of these mechanisms is working as intended. For example, Tennessee courts have failed to provide relief to one death-row inmate, Paul House, despite the fact that the United States Supreme Court concluded that "it is more likely than not that no reasonable juror would have found [House] guilty beyond a reasonable doubt."

ABA, Evaluating Fairness and Accuracy in State Death Penalty Systems:  The Tennessee Death Penalty Assessment Report at iii-iv (footnote omitted). The ABA Tennessee Death Penalty Assessment Team recommended that:

> The State of Tennessee should create an independent commission, with the power to conduct investigations, hold hearings, and test evidence, to review claims of factual innocence in capital cases. If the commission sustains the inmate's claim of factual innocence, it would either (a) forward to the Governor a recommendation for pardon or (b) submit the case to a panel of

judges, who would review the claim without regard to any procedural bars. This sort of commission, which would supplement either the current post-conviction or clemency process, is necessary, in large part because of procedural defaults and inadequate lawyering sometimes prevent claims of factual innocence from receiving full judicial consideration.

*Id.* at vi.

In Tennessee, a criminal defendant facing capital charges, has available several remedies both at trial and post-trial of asserting and raising the issue of innocence. *See generally* Dwight Aarons, Adjudicating Claims of Innocence for the Capitally Condemned in Tennessee:Embracing A Truth Forum, 76 Tenn. L. Rev. 511, 512-19 (2009). At trial, the defendant puts the State to its burden of proof and invoking the presumption of innocence. Once the criminal defendant is convicted, the presumption of innocence is replaced by a finding of guilt and the criminal defendant now bears the burden of establishing his innocence. The criminal defendant may move for a motion for judgment of acquittal in the trial court. *Id.* at 514. The next step for asserting actual innocence is on direct appeal. On direct appeal, a defendant may raise a claim of actual innocence by maintaining that there was insufficient evidence to support a first degree murder conviction. *Id.* at 515. If a criminal defendant does not succeed on direct appeal, several post-trial avenues of seeking a forum for his innocence claim are available. Claims of actual innocence may be brought in a petition for writ of error coram nobis alleging subsequently or newly discovered evidence. *See Dellinger v. State*, 279 S.W.3d 282, 291 n.7 (Tenn. 2009) (citing T.C.A. § 40-26-105). The petition for coram nobis relief must be brought within one year after the judgment of conviction in the trial court becomes final, or later if the defendant shows that due process precludes application of the statute of limitation. *Id.* (citing *Mixon*, 983 S.W.2d at 670; *Workman*, 41 S.W.3d at 103). In *Dellinger v. State*, 279 S.W.3d 282 (Tenn. 2009), our supreme court also recognized that a claim of actual innocence based upon new scientific evidence could be heard in an original petition for post-conviction relief as well as in a petition filed after the limitations period for filing said petition had expired. *Id.* The decisions in these post-trial proceedings are appealable to the state's appellate courts.

Petitioner has availed himself of the available avenues of relief in asserting a claim of actual innocence in Tennessee state courts. Petitioner has failed to assert or establish how he has been denied judicial review of his claim of actual innocence as such is currently a claim for review before this Court. As to whether Tennessee is constitutionally required to expand its avenues for seeking review of claims of actual innocence, this Court declines invitation to venture into this realm. The recommendations of the ABA Tennessee Death

Penalty Assessment Team are suggestions and are not constitutionally mandated. The United States Supreme Court has repeatedly rejected the invitation to determine whether the execution of an innocent person violates the United States Constitution and has expressed considerable doubt that any claim based on alleged "actual innocence" is constitutionally cognizable. *See House v. Bell*, 547 U.S. 518, 555, 126 S. Ct. 2064, 2087 (2006); *Herrera v. Collins*, 506 U.S. 390, 400-01, 416-17, 113 S. Ct. 853, 860-61,869 (1993); *see also*, *District Attorney's Office for Third Judicial Dist. v. Osborne*, __U.S.__, 129 S. Ct. 2308, 2321-22 (2009); *see also Dellinger*, 279 S.W.3d at 290, n.4. For these reasons, Petitioner is not entitled to relief on this claim.

## B.  Inadequate Access to Experts and Investigators

Petitioner contends that, despite the critical importance of access to proper expert and investigative resources in capital cases, many defendants in Tennessee are denied these necessary resources because Tennessee fails to provide adequate funding for defense counsel, experts, and investigators in capital cases. In support of his argument, Petitioner cites to Rule 13, of the Rules of the Tennessee Supreme Court, which sets limits on the hourly rates of compensation for experts and/or investigative services. Petitioner contends that Rule 13 infringes upon a capital defendant's right to present a defense in that Rule 13 limits the amount of funding for investigative services in capital post-conviction cases to $20,000 and, for all expert services, to $25,000. *See* Tenn. Sup. Ct. R. 13 § 5(d)(4),(5) (stating that "[T]rial court shall not authorize more than a total of $20,000 for *all* investigative services, unless . . . trial court determines that extraordinary circumstances exist . . ." "[T]rial court shall not authorize more than a total of $25,000 for the services of *all* experts, unless . . . trial court determines that extraordinary circumstances exist . . . ."). Petitioner asserts that capital defendants are further limited by the constraints of Rule 13 §5(b)(1), which requires that "the expert or investigator must be within 150 miles of the court where the proceeding is pending." *See*  Tenn. Sup. Ct. R. 13 § 5(b)(1) (stating that "[E]very effort shall be made to obtain the services of a person or entity whose primary office of business is within 150 miles of the court where the case is pending. If the person or entity . . . is not located within the 150-mile radius, the motion shall explain the efforts made to obtain the services of a provider within the 150-mile radius.").

Petitioner fails to delineate how the application of Rule 13, of the Rules of the Tennessee Supreme Court, infringed upon his right to prepare for and present evidence to support his petition for post-conviction relief.  Rather, Petitioner cites to trial counsel's failure to call an expert medical witness to testify at Petitioner's trial. In as much as Petitioner infers that the limitations on funding contained in Rule 13 § 5 (d)(4), (5) of the

Rules of the Tennessee Supreme Court, prevented trial counsel from obtaining expert assistance at the trial level, such inference does not hold water. The Rules relied upon by Petitioner refer only to capital *post-conviction* proceedings. Rule 13, §5(a)(1) of the Rules of the Tennessee Supreme Court, specifically provides, in relevant part, that "[i]n the trial . . . of all criminal cases . . . the court may . . . grant prior authorization for services in a reasonable amount to be determined by the court." *See also* T.C.A. § 40-14-207(b) (allowing for "[R]eimbursement of reasonable and necessary expenses"). No limitation on the amount of funding is provided for services rendered prior to conviction, although such funding should be "reasonable." Petitioner has otherwise failed to define how application of Rule 13 of the Rules of the Tennessee Supreme Court infringed upon his right to litigate his petition for post-conviction relief. This Court will not engage in speculation regarding alleged infringements of constitutional rights. Petitioner is not entitled to relief on this ground.

## C. Lethal Injection Constitutes Cruel and Unusual Punishment

Petitioner asserts that lethal injection, the method of execution currently utilized by the Tennessee Department of Correction, constitutes cruel and unusual punishment. Petitioner asserts that, "the current execution procedure for lethal injection in Tennessee involves the unnecessary and wanton infliction of pain because, among other things:"

- There is no check for consciousness, meaning that there is a substantial risk that the inmate will be conscious when the lethal drugs are administered and, as a result, will suffer a "terrifying and excruciating death." *Harbison v. Little*, 511 F.Supp.2d 872, 883-84 (M.D. Tenn. 2007).

- None of the three executioners who administer the lethal injection are trained medical professionals. *Id.* at 887.

- The executioners do not receive any instruction from paramedics or other medically qualified individuals, nor do they troubleshoot potential problems that might occur, such as catheter infiltration, which is problematic because intravenous catheters sometimes fail, and catheter slippage even occurs frequently in hospitals when done by highly trained professionals. *Id.* at 887-89.

61

- Despite the importance of tactile monitoring of the IV site, Tennessee employs only a system of visual observation by a minimally trained person, who observes the IV lines through a one-way window and a video screen from the separate executioners' room. *Id.* at 891.

- Executioners are not screened for drug problems or psychological disorders. In fact, one of Tennessee's IV paramedics team members at Riverbend Security Institution in Nashville - the very prison where Thomas is housed - has a history of drug and alcohol addiction, as well as psychological disorders. *Id.* at 887-88. In addition to pleading guilty to possession of a controlled substance and to being hospitalized in an alcoholic treatment program from April-June of 2006, this paramedic was diagnosed with "deep-rooted" depression in the spring of 2006 and is currently taking Paxil. *Id.*

Petitioner's arguments in support of his position are based upon previous findings made by a federal district court judge in *Harbison v. Little*, 511 F. Supp. 2d 872 (M.D. Tenn. 2007), *vacated and remanded*, 571 F.3d 531 (6th Cir. 2009). 511 F.Supp.2d at 903. Petitioner makes these complaints with acknowledgment that the United States Supreme Court has upheld the Commonwealth of Kentucky's three-drug lethal injection protocol as not being violative of the Eighth Amendment in *Baze v. Rees*, 553 U.S. 35, 128 S. Ct. 1520 (2008).

Petitioner relies upon the federal district court's findings in *Harbison* to support his challenge to Tennessee's lethal injection protocol. We decline to adopt the findings of the federal district court. In *Harbison v. Little*, 571 F.3d 531 (6th Cir. 2009), the Sixth Circuit Court of Appeals, with reliance upon *Bazes v. Rees*, explicitly rejected the district court's rulings in *Harbison* regarding Tennessee's lethal injection protocol. 571 F.3d at 537-39. Specifically, the Sixth Circuit Court of Appeals concluded that: (1) a visual inspection of the inmate by the warden for consciousness was sufficient to protect the inmate's Eighth Amendment rights; (2) Tennessee's protocol provided sufficient criteria for the selection and training of personnel; and (3) Tennessee's protocol requiring the warden to be in the execution room in order to guard against problems and requiring the IV line to be monitored visually by other execution team members by video camera and through a one-way window are constitutionally sufficient. *Id.* In effect, the Sixth Circuit rejected the same arguments now posed by Petitioner on appeal to this Court.

Notwithstanding the decision of the Sixth Circuit in *Harbison*, we note that this Court is not bound by the decisions of the federal district and circuit courts of appeal. Rather, this

62

Court is bound (1) to follow the decisions of the Tennessee Supreme Court, and (2) to follow the applicable constitutional rulings of the United States Supreme Court. *See State v. McKay*, 680 S.W.2d 447, 450 (Tenn. 1984), *cert. denied,* 470 U.S. 1034, 105 S. Ct. 1412 (1985); *State v. Green*, 995 S.W.2d 591, 600 (Tenn. Crim. App. 1998); *State v. Bowers,* 673 S.W.2d 887, 889 (Tenn. Crim. App. 1984). Our state supreme court has consistently upheld Tennessee's three-drug lethal injection protocol. *See State v. Kiser*, 284 S.W.3d 227, 275-76 (Tenn. 2009), *cert. denied*, __U.S.__ 130 S. Ct. 229 (2009); *State v. Banks*, 271 S.W.3d 90, 160 (Tenn. 2008), *cert. denied*, __U.S.__ 129 S. Ct. 1677 (2009); *Abdur'Rahman v. Bredesen*, 181 S.W.3d 292, 305-14 (Tenn. 2005). We are unable to conclude that Tennessee's lethal injection procedure, as established by precedent set by our supreme court*,* is unconstitutional. Petitioner is not entitled to relief on this claim.

## CONCLUSION

After a thorough review of the record and the law applicable to the issues raised herein, we conclude that Petitioner has failed to prove allegations contained in his post-conviction petition by clear and convincing evidence. The post-conviction court properly denied Petitioner relief. Accordingly, the judgment of the post-conviction court is affirmed.

_____

JERRY L. SMITH, JUDGE